THE VILLAGE OF HILLSIDE *et al.*, Plaintiffs-Appellants, *v.* JOHN SEXTON SAND AND GRAVEL CORPORATION *et al.*, Defendants-Appellees.

First District (5th Division)    Nos. 80-2470, 81-289 cons.

Opinion filed March 26, 1982.

534

Richard M. Daley, State's Attorney, and Schain, Burney and Kenny, both of Chicago (Jane Clark Casey, James F. Henry, and Matthew Klein, Assistant State's Attorneys, and Jerome S. Schain, Thomas R. Burney, and Daniel H. Brown, of counsel), for appellants.

Mary E. Drake, of Maywood, for appellee Illinois Environmental Protection Agency.

Kirkland & Ellis, of Chicago (Daniel W. Vittum, Jr., Frank L. Winter, and Donald W. Rupert, of counsel), for other appellees.

PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

These consolidated appeals from declaratory judgments and the denial of injunctive and *mandamus* relief present for review two judg-

ments of the trial court in actions involving the transfer of certain permits and the issuance of a supplemental development permit to defendant John Sexton Sand and Gravel Corporation (Sexton) by the Illinois Environmental Protection Agency (Agency) for a sanitary landfill. Plaintiff Village of Hillside (Village), a non-home-rule municipality, here contends that (1) the Agency was barred from transferring solid waste permits to Sexton without first adopting formal transfer procedures as required by rules of the Illinois Pollution Control Board (Board); (2) the Agency's transfer of permits, approval of a supplemental development permit and its land-use decision-making process had no rational basis; and (3) the Village has zoning jurisdiction over the sanitary landfill within its corporate limits. In addition, the County contends that (1) the Agency exceeded its authority under the Illinois Environmental Protection Act (Ill. Rev. Stat. 1979, ch. 111½, par. 1001 *et seq.*) (Act) by transferring development and operating permits to Sexton without prior adoption of formal procedures as mandated by Board rules; and (2) the Agency's permit transfer procedure violated its duty to insure a safe environment under the Act.

It is undisputed that the site, which is commonly known as the Hillside Quarry (Quarry) and is the subject of these proceedings, occupies approximately 75 acres within the corporate limits of the Village and was formerly used to quarry limestone. Prior to the events which gave rise to the present case, the Agency granted operating permit No. 1973-53-OP to Hillside Stone Corporation (Hillside Stone) to operate a solid waste disposal facility at the Quarry for broken concrete, natural earth material and a limited amount of putrescible demolition material. The Agency granted Hillside Stone a second permit (No. 1975-57-DE) to use the Quarry for general solid waste disposal, except for hazardous, liquid, sludge, and special wastes. Both permits were issued subject to compliance with the Village zoning ordinance, and the Agency had previously received a letter from the then-mayor of the Village indicating that local zoning permitted a landfill at the Quarry. The Agency also issued two supplemental permits to Hillside Stone. Permit No. 76-46 allowed further development of the Quarry besides as a general solid waste disposal site, and permit No. 76-397 allowed disposal of various combustion byproducts, both permits being subject to certain conditions not relevant here.

Thereafter, Commonwealth Edison Company (Edison) purchased the Quarry from Hillside Stone, intending to use it as a landfill for disposal of combustion byproducts. Per request, the Agency transferred permits Nos. 1973-53-OP, 1975-57-DE and 76-397 to Edison. It also issued supplemental permit No. 1977-39 to Edison permitting the use of clay as a liner material.

On May 7, 1979, Sexton and Browning-Ferris Industries, Incorporated (Browning-Ferris) (hereinafter referred to as private defendants),

doing business as Congress Development Company, a partnership engaged in the development and operation of sanitary landfills,[1] signed a sales agreement with Edison to purchase the Quarry.[2] On May 9, 1979, Edison and Sexton requested the Agency to transfer to Sexton certain solid waste management permits held by Edison, and on that date Sexton applied for a supplemental development permit and submitted plans prepared by its engineering firm, seeking approval to modify development of the site in accordance with those plans.

Notice of the permit transfer request and of the supplemental permit application was thereafter sent by the Agency to surrounding municipalities, area legislators, the Cook County State's Attorney, and the Chairman of the Cook County Board, as required by the Act. (Ill. Rev. Stat. 1979, ch. 111½, par. 1039(c).) Although not so required, notice also was sent to adjacent landowners, and at the request of the Village public hearings were held by the Agency regarding the permit transactions. Prior to those hearings, a list of nine issues was circulated to counsel concerning matters which the Agency considered relevant to its decisions in permit hearings. The Village and some of its citizens participated in the hearings which transpired during 8 days and 3 evenings between June 12 and July 10, 1979. Thereafter, on August 14, 1979, the Agency transferred to Sexton all previously issued permits, and on August 15, 1979, the Agency issued to Sexton a supplemental permit (No. 1979-1715), allowing Sexton, subject to certain conditions, to modify the development of the site in accordance with the plans of its engineering firm.

On July 18, 1980, Sexton requested an operating permit from the Agency, which was granted to private defendants on August 28, 1980 (No. 1975-57-OP), and restricted operation of the site to the disposal of general municipal solid waste—excluding liquid, special, and hazardous wastes. Private defendants commenced a sanitary landfill operation at the Quarry under permit No. 1975-57-OP on September 15, 1980.

Relevant to our consideration is count II of the Village's fourth amended complaint and the County's petition to intervene and intervening complaint, all of which generally alleged that the transfer of permits by the Agency violated the Board's procedures. On September 15, 1980, following hearings on the motions for declaratory judgment, temporary restraining order, and injunction, the trial court found, *inter alia*, that the Village did not assert environmental harm or damage from the activities of private defendants; it lacked jurisdiction to enter an injunction based

---

[1] Sexton is the sole operator of the facility for the partnership.

[2] On May 23, 1979, Edison petitioned the Illinois Commerce Commission for approval of the sale pursuant to section 27 of the Public Utilities Act (Ill. Rev. Stat. 1979, ch. 111 2/3, par. 27). The sale was approved on July 16, 1980, and Edison conveyed title in fee simple to private defendants on July 24, 1980.

on count II or section 42(d) of the Act (Ill. Rev. Stat. 1979, ch. 111½, par. 1042(d)) as alleged by the County; no administrative remedy existed to evaluate the Agency's issuance of a permit or approval of a transfer permit; private defendants did not violate the Act as alleged and thus could not be enjoined from exercising their rights under the permits; although the Agency did not comply with Rules 211 and 213 in transferring the permits, Rule 211 and Rule 213 insofar as it applied to the Agency's permit administration authority (Ill. Rev. Stat. 1979, ch. 111½, pars. 1004(g), 1039(a)) are void as exceeding the Board's statutory authority; the Agency's standardized form required of applicants in support of requests for transfer of solid waste management permits is an adequate procedure; count II, the County's complaint and the motions for a temporary restraining order, were in effect petitions for writs of *mandamus*, since plaintiffs sought to compel the Agency to strike and expunge the operating permits issued on August 28, 1980; and those operating permits were properly issued. Accordingly, the trial court denied the motions for a temporary restraining order and for *mandamus*, dismissed the Village's count II and the County's complaint, and held that Rule 211 and the relevant part of Rule 213 were invalid.

On November 12, 1980, following renewal by the Village of its motions for declaratory judgment, temporary restraining order and injunction based on various counts of its fourth amended complaint, the trial court found, *inter alia*, that all defendants were entitled to judgment on the issues of the Agency's procedure in permit decisions; its alleged bias and incompetence; its alleged failure to impose conditions on the relevant permits; the permit transfers; and the rules, regulations and standards regarding the Agency's administration of the permit system; that the Village, as a non-home-rule municipality, was preempted from applying its zoning ordinance to the site; and that the Agency's decisions to transfer and issue permits were entitled to a presumption of validity. Accordingly, the trial court dismissed the counts in question with prejudice and denied the motion for a temporary restraining order.

On January 9, 1981, the trial court entered an order—subsequently modified *nunc pro tunc*—finding, *inter alia*, that its order of November 12, 1980, was correct except as to one count of the Village's fourth amended complaint, for which the Village's motion for rehearing was continued.

The Village and the County appeal from the order of September 15, 1980, requesting that such order be reversed; their motions for a temporary restraining order and preliminary and permanent injunction be granted; the permits in question and the transfer of all such permits to Sexton be declared invalid; Rules 211 and 213 be declared valid; and the petitions for writ of *mandamus* be granted. The Village also appeals from the order of January 9, 1981, requesting that such order and that of No-

vember 12, 1980, be reversed; and that its motion for temporary restraining order and preliminary and permanent injunction be granted.

OPINION

We first consider the effect of Rules 211 and 213 on the Agency's permit transfer procedures. Plaintiffs contend that Rules 211 and 213 are valid exercises of the Board's authority over the agency and that since the Agency failed to adopt formal transfer procedures, as purportedly required by those rules, the transfer of permits to Sexton exceeded the Agency's authority. Rules 211 and 213 of chapter 7 of the Illinois Pollution Control Board Rules and Regulations (effective July 27, 1973) (Rules) provide as follows:

"Rule 211: Transfer of Permits. No permit is transferable from one person to another except as approved by the Agency under procedures it adopts pursuant to Rule 213."

"Rule 213: Design, Operation, and Maintenance Criteria. (a) The Agency may adopt procedures which set forth criteria for the design, operation, and maintenance of solid waste management site and other procedures the Agency deems reasonably necessary to perform its duties under this Chapter, and as are consistent with Part III thereof. All such procedures shall be revised from time to time to reflect current engineering judgment and advances in the state of the art. Such procedures and revisions thereto shall not become effective until filed with the Index Division of the Office of the Secretary of State pursuant to 'An Act concerning Administrative Rules,' approved June 14, 1951, as amended. (b) Before adopting new criteria or making substantive changes to any criteria adopted by the Agency, the Agency shall:

(1) publish a summary of the proposed changes in the Board Newsletter; and

(2) provide a copy of full text of the proposed changes to all persons who hold Agency permits or have active applications pending, and any person who in writing so requests; and

(3) defer adoption of the changes for 60 days from the date of publication to allow submission and consideration of written comments on the proposed changes."

In our view, Rule 211 requires the Agency to follow Rule 213 in adopting procedures for all permit transfers. Rule 213(a) is permissive and advisory as to the Agency's initial adoption of procedures incorporating "criteria for the design, operation, and maintenance of solid waste management site" and of procedures "reasonably necessary" to carry out its duties. Such procedures as are adopted also must be consistent with the sub-

stantive requirements for sanitary landfills of part III of the Rules. Rule 213(a) also requires the Agency to revise those procedures to keep pace with engineering and technological changes, and it imposes a filing requirement before any procedure or revision can be effective. Thus, while Rule 213(a) recommends the initial adoption of procedures, once adopted the Agency is constrained to update them as conditions demand. To the extent of such constraints, Rule 213(a) requires the formal adoption of procedures for the transfer of permits, and it imposes a procedural duty on the Agency through the filing requirement.

Rule 213(b), by contrast, sets forth prerequisites which the Agency must satisfy before adopting or changing any criteria. Thus, if the Agency proposes to adopt new criteria or to change existing criteria, it must first comply with Rule 213(b); but if it seeks to adopt procedures deemed necessary to perform its duties, it need not comply with Rule 213(b), which by its terms governs only criteria. Thus, since Rule 213(b) does not refer to procedures, it is inapplicable, and we are concerned with Rule 213(a) only. We conclude, however, that the Act grants the Board no authority to enact Rules 211 and 213(a) and, indeed, contemplates that the Agency adopt its own procedures.

It is fundamental that the source of the power or authority claimed by an administrative agency must be found within the statute creating it. (*Bio-Medical Laboratories, Inc. v. Trainor* (1977), 68 Ill. 2d 540, 370 N.E.2d 223.) The Act in question allocates such power between the Board and the Agency for the issuance of permits in the effort to eliminate environmental pollution, and the distribution of those powers was further defined in *Landfill, Inc. v. Pollution Control Board* (1978), 74 Ill. 2d 541, 557, 387 N.E.2d 258, 264:

"The Board's principal function is to adopt regulations defining the requirements of the permit system (Ill. Rev. Stat. 1975, ch. 111½, pars. 1005(b), 1039). The Agency's role is to determine whether specific applicants are entitled to permits (Ill. Rev. Stat. 1975, ch. 111½, par. 1039). The need for a technical staff capable of performing independent investigations dictates that the job of administering the permit system be entrusted to the Agency rather than the Board [citation]."

The Board, which was created under section 5(a) of the Act (Ill. Rev. Stat. 1979, ch. 111½, par. 1005(a)), functions in the area of land pollution and refuse disposal primarily to establish statewide environmental control standards (Ill. Rev. Stat. 1979, ch. 111½, par. 1005(b)) to adopt additional regulations requiring the operator of a waste disposal facility to obtain a permit (Ill. Rev. Stat. 1979, ch. 111½, pars. 1021, 1039(a)) and to prescribe by regulation the substantive standards under which such permits should be issued (Ill. Rev. Stat. 1979, ch. 111½, pars. 1022(a)(b), 1027(a)). Al-

though the Board must determine, define, and implement environmental control standards and may adopt procedural rules necessary for those purposes (Ill. Rev. Stat. 1979, ch. 111½, pars. 1005(b), 1026, 1027), its power to adopt such rules has not been extended to the issuance or transfer of permits (see *Environmental Protection Agency v. Pollution Control Board* (1981), 86 Ill. 2d 390, 427 N.E.2d 162).

By contrast, the Agency, which was created under section 4(a) of the Act (Ill. Rev. Stat. 1979, ch. 111½, par. 1004(a)), administers the permit systems established by the Act or by Board regulations (Ill. Rev. Stat. 1979, ch. 111½, par. 1004(g)). Thus, applicants for permits, including the operators of refuse-disposal facilities, must apply to the Agency (see Ill. Rev. Stat. 1979, ch. 111½, par. 1021(d)) which is authorized, for example, to require submission of plans and specifications (Ill. Rev. Stat. 1979, ch. 111½, par. 1004(h)) and to set permit fees (Ill. Rev. Stat. 1979, ch. 111½, par. 1004(i)). Moreover, the Agency alone is empowered to issue or deny permits or to issue permits subject to conditions, and it is authorized to adopt procedures necessary to fulfill its permit-granting functions. Ill. Rev. Stat. 1979, ch. 111½, par. 1039(a).

■■ We think it clear, in light of the statutory scheme and case law, that the Act requires the Board to adopt rules requiring permits and to set substantive standards under which the Agency may issue such permits. The purpose of the Agency, on the other hand, is to establish procedures for the administration of the permit system in order to insure that those standards are met. Thus, the Agency is authorized to determine if a permit should issue or be transferred for a particular refuse-disposal facility and to adopt appropriate procedures. The Board may not require the Agency to adopt procedures or impose procedures on it for issuing or transferring permits. As fully discussed below, the Agency would apparently be required to comply with Rules 211 and 213(a) since it has adopted its own procedures for transferring permits and issuing supplemental permits. It would thus be obliged to update them "to reflect current engineering judgment and advances in the state of the art" and to meet the filing requirement. Therefore, we hold that Rules 211 and 213(a), to the extent they apply to permit transfers, are unauthorized assumptions of the Agency's functions under sections 4(g) and 39(a) of the Act and are invalid as applied to the Agency's permit transfer authority.

Our determination is consistent with the reading of the Act in *Landfill, Inc. v. Pollution Control Board* (1978), 74 Ill. 2d 541, 387 N.E.2d 258. In that case, two Board procedural rules, which purported to authorize it to review Agency decisions granting solid waste management permits, were held invalid. Finding no statutory authority for such review, the supreme court stated that the Board's intrusion into Agency permit activity was "clearly an unauthorized assumption by the Board of authority

to grant permits delegated by the Act to the Agency" and would "make the Board the permit-granting authority, a usurpation of the Agency's function." (74 Ill. 2d 541, 558, 387 N.E.2d 258, 264.) Similarly, in the present case, the Board cannot assert authority over the Agency through Rules 211 and 213(a) in a manner which usurps function delegated to the Agency under the Act.

We next address the Village's challenges to the Agency's transfer and supplemental permit systems and to its general decision-making process. The Village maintains that the Agency's permit systems and procedure lack rules, regulations, or standards to guide Agency decisions; that Agency decision-makers lacked necessary background, expertise, and accountability in exercising their permit-granting authority; and that, as the permit decisions made in this case were contrary to the facts and the law, they had no rational basis. As explained below, we reject each contention.

First, concerning the permit transfer system, the record indicates that the Agency utilizes a standard form which an applicant for a solid waste management permit transfer is required to complete. The information required in the form consists of a request by the permit transferor with an enumeration of permits to be transferred; identification of the permit transferee, the landowner, and the site; the type of interest in the land held by the transferee; and the type of business entity responsible for the facility. The accuracy of the information supplied must be ensured by the transferor, transferee, and landowner, and those assurances require attestation. The form also states that any change from the original permit application must be requested in a supplemental permit application. The transferee otherwise adopts the information supplied by the transferor in the original application and all supplemental permits. The form also includes a section for the Agency's use which identifies the person reviewing the form, the date received, and the action taken.

■■ In our view, the information required on the transfer permit application satisfies the Agency's duty under section 39(a) of the Act (Ill. Rev. Stat. 1979, ch. 111½, par. 1039(a)), which provides in relevant part:

> "When the Board has by regulation required a permit for the construction, installation, or operation of any type of facility, * * * the applicant shall apply to the Agency for such permit and it shall be the duty of the Agency to issue such a permit upon proof by the applicant that the facility, * * * will not cause a violation of this Act or of regulations hereunder."

We believe the information required in the standardized form, when read with the prior permits, affords the Agency sufficient data to determine, as it must, whether operation of a facility could violate the Act or Board regulations. (See *Winnetkans Interested In Protecting The Environment (WIPE) v. Pollution Control Board* (1977), 55 Ill. App. 3d 475, 370 N.E.2d

1176.) Completion of the form and the guarantees of the accuracy of the information thus provide proof reasonably calculated to guide the Agency in making permit transfer decisions.

We also think it significant that the question of permit transfers was considered by the Agency at the extensive public hearings held in June and July 1979, which included consideration of Sexton's ability to operate the site in an environmentally safe manner, and the Village does not assert or indicate from the record that the site is not operated safely. Furthermore, the Village does not assert that transfer permits would not have issued had additional or different information been required, nor does it suggest what such information should be. Therefore, any defects that may have existed concerning permit transfer procedures were adequately rectified in the present case.

In this regard, the County contends that the Agency's standardized transfer application form used here was inadequate because it required only superficial information, unlike the detailed information that an original applicant must file, and it further contends that the Agency's transfer of permits to Sexton abridged the constitutional right of Illinois citizens to a safe environment. Ill. Const. 1970, art. XI, §2.

In support of its position, the County suggests that Board Rule 316 is preferable because it elicits adequate information. That rule pertains to sanitary landfill development permits and requires an applicant to enumerate factors concerning the physical characteristics of the site, such as land use and population density information of the surrounding area, and the ability of the operator to develop and operate the site in an environmentally safe manner. The County maintains that a change of operators of a sanitary landfill resulting from a permit transfer could have adverse environmental consequences and that information sufficient to avoid such result is not required in a transfer permit application.

■■ While such additional detail may be desirable, it would serve no purpose in the present case, since previously issued development permits were transferred to Sexton, from which the information was incorporated into the permit transfer application. Thus, the Agency restricts the transferee to the terms and conditions of the original permit and, as noted above, considers the environmental impact of the transfer under section 39(a) in its review of the application. The County does not contend that Rule 316 requires any information not previously given in the original permits, although it asserts that the operator's previous experience in waste management should be assessed. The record does not reveal, however, any adverse environmental effects from the transfer of permits to Sexton or that Sexton has an unsatisfactory record of waste management. Indeed, neither plaintiff challenges the trial court's finding in the judgment of September 15, 1980, that they were not asserting environmental

harm from the activities of private defendants. The plaintiffs' contentions as to the Agency's permit transfer system are, therefore, without merit.

Turning to the Village's challenge to the supplemental permit system, we note that section 39(c) of the Act authorizes the Agency to issue supplemental permits to modify the development, operation, or type of wastes accepted at a site (Ill. Rev. Stat. 1979, ch. 111½, par. 1039(c)), and that, as indicated by the record, in making such permit decisions the Agency relies on Board Rule 210, which provides:

> "No person shall cause or allow modification of any solid waste management site, or accept any type of waste except under conditions specified in a permit issued by the Agency. Development, operating and experimental permits may be modified by a supplemental permit issued by the Agency to allow such modifications."

The Village argues for articulated rules and standards to confine the Agency's discretion in issuing supplemental permits but does not suggest what those rules or standards should be or how they would have affected the outcome of the present dispute. In our view, however, Rule 210 limits operators seeking to modify solid waste sites to the conditions which the Agency must specify in permits. The rule also makes clear that the specific conditions for modification be articulated by the Agency in the permit. If such conditions were not defined, then, as the rule implies, it would be improper to issue the permit. Our view also is reinforced by the fact that a supplemental permit may not issue unless development and operating permits were previously issued.

■■ The Agency's discretion is further confined by Rule 206(a), which provides in relevant part that "[t]he Agency may impose such conditions in a permit as may be necessary to accomplish the purposes of the Act," and by Rule 207, which prohibits the Agency from issuing a supplemental permit unless the applicant submits proof that modification of the site will not violate the Act or Board Rules and conforms to specified criteria. Thus, we believe that those Rules establish adequate criteria for issuance of supplemental permits and properly implement the Agency's authority under section 39(c). *Cf. Carlson v. Village of Worth* (1976), 62 Ill. 2d 406, 343 N.E.2d 493, where the court held that Board Rule 316 provides adequate standards under sections 22 and 27 of the Act (Ill. Rev. Stat. 1973, ch. 111½, pars. 1022, 1027) for the Agency to make rational decisions concerning the issuance of development permits for sanitary landfills.

Additionally, we find no support in the record for the Village's contention that the Agency is uncertain as to the "legal effect" of permit No. 76-397 or of supplemental permits in general. Permit No. 76-397 was originally issued to Hillside Stone and allowed disposal of combustion byproducts. The Village asserts that Agency employees could not agree

as to whether No. 76-397 limited the type of materials that could be accepted at the site. No such confusion appears in the record, however, as it is clear the employees in question took the position that the site could have been developed for disposal of general solid waste and combustion byproducts under other permits issued prior to the time private defendants acquired it. Neither does it appear that those employees seriously misunderstood the purpose of supplemental permits. Accordingly, we reject this contention.

Concerning the general assertion of procedural deficiencies in the Agency's permit systems, the Village initially contends that the Agency should have explained its decisions through written findings of fact. In *Citizens to Preserve Overton Park, Inc. v. Volpe* (1971), 401 U.S. 402, 28 L. Ed. 2d 136, 91 S. Ct. 814, a decision of the Secretary of Transportation to authorize Federal funds for highway construction through a public park was challenged. The 1968 Federal Highway Act required a determination by the Secretary that no feasible and prudent alternative route existed and that all possible planning to minimize harm to the park had been done. Although remanding the case for judicial review of the administrative record, the court held that formal findings by the Secretary were unnecessary since not required by the controlling statute. Similarly, under the applicable statute and rules of the present case, the Agency's decision is not invalidated by the absence of formal findings of fact. *Cf. Lindburg v. Zoning Board of Appeals* (1956), 8 Ill. 2d 254, 133 N.E.2d 266, which involved a statutory requirement that every zoning board variation " 'shall be accompanied by a finding of fact specifying the reason for making the variation.' " 8 Ill. 2d 254, 255, 133 N.E.2d 266, 267.

■■ Although findings of fact must be express if required by statute (see *Maywood Park Trotting Association v. Illinois Harness Racing Com.* (1959), 15 Ill. 2d 559, 155 N.E.2d 626) and supported by evidence which appears of record (*Cook County Federal Savings & Loan Association v. Griffin* (1979), 73 Ill. App. 3d 210, 391 N.E.2d 473), "[t]he principal reason given for requiring written findings by an administrative agency, in the absence of statutory command, is that they are necessary for orderly and efficient judicial review" (*Telcser v. Holzman* (1964), 31 Ill. 2d 332, 338, 201 N.E.2d 370, 373; also see *Reinhardt v. Board of Education* (1975), 61 Ill. 2d 101, 329 N.E.2d 218). Our examination of the Act and Rules reveals no requirement that the Agency present written findings for granting a solid waste management permit. It does not appear, however, that the lack of written findings here has significantly disrupted judicial review, as we are able to ascertain whether the record affords a fair and reasonable basis for the Agency's permit decisions. (See *Shallow v. Police Board* (1978), 60 Ill. App. 3d 113, 376 N.E.2d 1025; *Carrao v. Board of Education* (1977), 46 Ill. App. 3d 33, 360 N.E.2d 536.) Moreover, the Agency's

reasons for granting a permit are defined in the applications, since compliance by an applicant with the requirements embodied in those forms ordinarily leads to the granting of a permit. (*Cf.* Ill. Rev. Stat. 1979, ch. 111½, par. 1039(a), which requires the Agency to state reasons for denying a permit.) Therefore, we believe it was sufficient in the present case that the Agency's findings were adequate to support its decisions and had a substantial foundation in the evidence (see *Ford v. Environmental Protection Agency* (1973), 9 Ill. App. 3d 711, 292 N.E.2d 540), and the Agency's decision is not subject to objection because findings were not specified in the form the Village desires (see *Irving's Pharmacy v. Department of Registration & Education* (1979), 75 Ill. App. 3d 652, 394 N.E.2d 627).

■■ Secondly, concerning the Village's assertion that the Agency adopt substantive rules and regulations for its permit systems, we conclude that formal decision-making standards exist and were utilized in the present case, so that additional regulations need not be adopted. Section 20 of the Act (Ill. Rev. Stat. 1979, ch. 111½, par. 1020), in setting forth legislative declarations and purpose, provides adequate standards. That section takes the historical consequences of land pollution and refuse disposal into account by seeking to eliminate scenic blight, public health and safety hazards, public nuisances, depression of property values, offense to the senses, and interference with community life and development. Furthermore, in *Carlson v. Village of Worth* (1976), 62 Ill. 2d 406, 343 N.E.2d 493, it was held that Board Rule 316 provides adequate standards for the Agency to make rational decisions regarding sanitary landfill locations, and those criteria are the basis of the Agency's evaluation of applications under Rule 316. The record further indicates that the "Nine Issues" formulated by the Agency for 1979 permit hearings embodies the objectives of section 20. Those issues, as noted above, were distributed prior to the hearings in question, and we believe they amply informed the parties as to the necessary facts to present and how they would be weighed. (*Cf. Mystic Tape v. Pollution Control Board* (1975), 60 Ill. 2d 330, 328 N.E.2d 5, where it was held that the Act provides sufficient standards for administrative decision-making in determining air pollution violations without the need to adopt additional standards.) Thus, we believe that the Agency has valid standards and procedures to carry out its land use decision-making functions. We have also examined the record concerning the Village's other procedural objections and conclude that they are without merit.

The Village also makes several related factual assertions in its challenges to the Agency's decision-making process. Those assertions, however, are not supported by the record. It contends, first of all, that Agency decision-makers lacked sufficient background and expertise to

comprehend the permit system, but the record makes clear that the competence of the relevant Agency employees was fully demonstrated and that their decisions in this case were based on a carefully reasoned assessment of technical and nontechnical evidence. Contrary to the Village's position, the purported difficulty of an agency's employee to explain to a layperson the often technical and complex policies and practices of an agency in fulfilling its duties does not, without more, render its action invalid. There is, in any event, nothing in the Act requiring the Agency personnel in this case to possess any particular background as a prerequisite to making the land use and site suitability decisions in question.

Secondly, the Village calls attention to certain letters by Agency personnel and maintains that those letters show advance approval by the Agency of the transfer permits, refusal to "rescind" the alleged approval and false denial of the sale to private defendants. Those letters indicate to us, however, that the Agency would not approve the permit transfer unless certain required conditions were met and that the allegedly false denial was a mistake and not intended to conceal information. Moreover, the Village does not explain what, if any, impact the letters may have had on the Agency's decisions. We do not believe, therefore, that the letters evidence a lack of accountability or preferential treatment by the Agency.

The Village further contends that the landfill operation is being conducted in violation of an earlier permit. However, the record indicates to the contrary. The original development permit (No. 1975-57-DE) authorized development of the Quarry for the disposal of general solid waste, and private defendants' authority to operate the facility derives from permit No. 1975-57-OP, which was issued directly to them on August 28, 1980, and allows operation in accordance with development permit No. 1975-57-DE, one of the permits transferred to Sexton, and as supplemented by permit No. 1979-1715. Therefore, we think it clear that those permits authorize a sanitary landfill at the site for disposal of general municipal waste.

We also reject the Village's assertion that the Agency lacked authority to transfer development permit No. 1973-53-DE and supplemental permit No. 76-46 to private defendants, as those permits had never been transferred from Hillside Stone to Edison. Agency employee Thomas Cavanagh testified at trial that the failure to list those permits in the transfer application from Hillside Stone to Edison was an oversight and that since the operating permit (No. 1973-53-OP) was dependent upon the development permit, it was unreasonable to include an operating permit on the transfer application without also including the development permit. The Village does not dispute that testimony nor contend that the

transfer of Nos. 1973-53-DE and 76-46 resulted in adverse environmental impact or led to the depositing of materials not allowed in those permits.

With respect to the Agency's procedure in the present case, we think it significant that notice of the permit applications was sent to appropriate parties under section 39(c) (Ill. Rev. Stat. 1979, ch. 111½, par. 1039(c)); that public hearings were scheduled at the Village's request and presided over by an Agency hearing officer, although such hearings are not required by the Act; that the hearings took place over 8 days and 3 evenings, during which the Village officials and several of its residents testified and otherwise participated; that the daytime hearings were "adversary," with witnesses under oath and the parties represented by counsel who presented evidence and cross-examined witnesses; that during the evening hearings, many public officials and private citizens made unsworn statements as to their views on the proposed landfill; that the list of nine issues relevant to the Agency's decisions was distributed to counsel for the Village beforehand; that Agency personnel visited the site and at other times sought to explain the Agency's actions and reasons to the Village; that the Agency had frequent contact with the Village's engineering consultant; and that Agency decision-makers considered all such evidence in reaching their decisions. (See *Carlson v. Briceland* (1978), 61 Ill. App. 3d 247, 377 N.E.2d 1138.) The trier of fact is in a superior position to that of the reviewing court with respect to matters presented at trial, and since we cannot say that on the basis of the record before us the trial court's decisions were contrary to the manifest weight of the evidence, we will not disturb those findings on review. (*La Salle National Bank v. County of Cook* (1957), 12 Ill. 2d 40, 145 N.E.2d 65.) We conclude, therefore, that as the Agency's decisions in this case were warranted by the facts and the law, they had a rational basis, and the trial court did not err.

■■ Finally, the Village contends that it has zoning jurisdiction over a landfill within its corporate limits. We think the law is clear, however, that non-home-rule units such as the Village are preempted by the Act from applying their zoning ordinances to sanitary landfills. (*County of Cook v. John Sexton Contractors Co.* (1979), 75 Ill. 2d 494, 389 N.E.2d 553; *Carlson v. Village of Worth* (1975), 62 Ill. 2d 406, 343 N.E.2d 493; *O'Connor v. City of Rockford* (1972), 52 Ill. 2d 360, 288 N.E.2d 432.) As stated in *Sexton:* "After *O'Connor* and *Carlson,* it is clear that the Act operates to exclude non-home-rule units from the regulation of sanitary landfills." (75 Ill. 2d 494, 507, 389 N.E.2d 553, 556.) It was also held in *Carlson* that the Agency cannot delegate its responsibility to decide whether a landfill should be permitted at a specific location. (62 Ill. 2d 406, 410, 343 N.E.2d 493, 496.) To make the landfill in question depend upon compliance with

the Village's zoning ordinance would be such an improper delegation. In view of those controlling authorities, the trial court did not err in finding that local zoning in the present case had been preempted.

In this regard, the Village also asserts that amendments to the Act erase the distinction between home-rule and non-home-rule units with respect to the preemption doctrine under the Act. Section 3(t) of the amendments classifies a sanitary landfill such as the one in question as a "regional pollution control facility." (Act of Nov. 12, 1981, Pub. Act 82-682, to appear at Ill. Rev. Stat. ch. 111½, par. 1003(t).) Section 3(t) further defines a new regional pollution control facility as:

> "(1) a regional pollution control facility initially permitted for development or construction after July 1, 1981; or
>
> (2) the area of expansion beyond the boundary of a currently permitted regional pollution control facility; or
>
> (3) a permitted regional pollution control facility requesting approval to store, dispose of, transfer or incinerate, for the first time, any special or hazardous waste."

Permits for such new facilities may not issue without proof to the Agency that the site has been approved, in accordance with statutory requirements, by the relevant county board or municipal governing body in the area where the facility is to be located. Act of Nov. 12, 1981, Pub. Act 82-682, to appear at Ill. Rev. Stat. ch. 111½, par. 1039(c).

In the present case, however, all previously issued permits were transferred to Sexton on August 14, 1979, and supplemental permit No. 1979-1715 was issued on August 15, 1979. In addition, operating permit No. 1975-57-OP was issued on August 28, 1980, and the landfill operation commenced under that permit on September 15, 1980. Thus, the landfill in question was not permitted for development or construction after July 1, 1981. Neither has the Village asserted that the area of the landfill is to be expanded beyond its original 75-acre boundaries, nor that it is designed to accept special or hazardous wastes. To the contrary, permit No. 1975-57-OP restricts operation of the site to disposal of general municipal solid waste and specifically excluded liquid, special, and hazardous wastes. Accordingly, the instant site cannot be regarded as a new regional pollution control facility within the amendments to the Act, and as those amendments do not apply, approval of the county board or municipal governing body is not required. Therefore, the Village's asserted right of zoning jurisdiction in the present case is without merit.

For the reasons stated, the judgments of the trial court are affirmed.

Affirmed.

LORENZ and WILSON, JJ., concur.