FRED G. H. LEE, Plaintiff-Appellant, *v.* ILLINOIS RACING BOARD
LABORATORY *et al.*, Defendants-Appellees.

First District (5th Division)   No. 79-929

Opinion filed August 15, 1980.

Carole K. Bellows, of Chicago, for appellant.

William J. Scott, Attorney General, of Chicago (Myra Turner, Assistant
Attorney General, of counsel), for appellees.

Mr. JUSTICE MEJDA delivered the opinion of the court:

This is an action under the Administrative Review Act (Ill. Rev. Stat.
1977, ch. 110, pars. 264 through 279) for the review of an order of the Civil
Service Commission of the State of Illinois (Commission), which
dismissed plaintiff Fred G. H. Lee (Lee) as a certified employee of the
Illinois Racing Board Laboratory (Laboratory). The trial court affirmed
the Commission's decision, and Lee has appealed, contending that (1) the
Commission's decision is against the manifest weight of the evidence and
is not supported by substantial evidence; (2) he was not dismissed for
cause; (3) he was illegally suspended without pay prior to investigation
and hearing; and (4) the Laboratory did not evaluate him on a yearly
basis, as required by the Personnel Rules of the State of Illinois.

We affirm. The facts are as follows.

Lee was employed by the Illinois Racing Board (Board) on June 1,
1973. He was assigned to work in the Laboratory in the position title of
Chemist IV and was certified as an employee on December 22, 1973. Lee

had been hired by John L. McDonald, director of the Laboratory, to be his assistant. A year later McDonald named another Chemist IV as his assistant but Lee's position classification was not changed.

On January 10, 1977, the Board initiated discharge proceedings against Lee, alleging that he was unable or unwilling to perform assigned tasks, that he created discord among Laboratory employees, and that he did not follow generally accepted standards of chemical laboratory work. The charges were amended to eliminate any of Lee's actions prior to 1976 and proceeded to hearing on the following specific allegations:

> "(1) On or about November 8, 9, 22, 29, 30, December 1 and December 4, 1976 [Lee], was given 7 urine samples and failed to give any conclusive chemical results in a reasonable period of time. (2) On December 16, 1976 at a bus stop on the way to work Mr. Lee approached Navin Pandya, Laboratory Technician II, and threatened him if he would not sign a written document prepared by Mr. Lee. On October 6, 1976 Mr. Lee assaulted physically and verbally Shelly Kalita in the laboratory by attempting to take out of her hands a dangerous chemical bottle of chloroform. (3) On October 28, 1976 Mr. Lee directed Navin Pandya to put technical grade chloroform into bottles not so labeled."

The hearing began on February 18, 1977, and concluded on June 17. On July 28, 1977, the hearing officer found that the charges had been proved and that they warranted discharge. The Commission adopted the hearing officer's findings on August 18, 1977, and ordered Lee's discharge.

John L. McDonald, the Laboratory director who had hired Lee, described the procedures of the Laboratory. Each year, the Laboratory receives approximately 25,000 blood and urine specimens from the various racetracks around the State. The Laboratory analyzes the specimens to determine whether they contain either controlled drugs, which are permissible within certain guidelines, or prohibited drugs, which may not be used at all for a racehorse. The Laboratory follows forensic procedures, maintaining a chain of custody on all exhibits so that the resulting data may be used in court if necessary.

The general analysis procedures followed in the Laboratory were described by McDonald and several other Laboratory employees: Lillian Gachich, a Chemist III; Jeff Wang, also a Chemist III; Raymond Lyons, a Chemist IV; and Shelly Kalita, a Technician. The specimens undergo a preliminary screening analysis to determine the presence of a controlled or prohibited substance. If any of these substances are present, a reconfirmation analysis, or recheck, is performed to verify the initial positive results.

The screening analysis begins with the extraction of the specimens at

pH levels of 5.5 and 9.5[1] and acid hydrolysis is performed. Thin layer chromatography (TLC), the first test conducted, is then performed. TLC separates the extract components on specially coated glass plates, which, when subject to different solvents, will separate the mixture into its various components. After TLC, gas chromatography (GC) is performed by putting the residue through a hot column and observing the reactions in the column. Based on these two tests, an opinion can be rendered as to what substance, if any, is present, because each substance has a characteristic reaction in TLC and GC. Opinions based on TLC and GC can be obtained in one to three days. Reconfirmation analysis is performed where unequivocal identification is needed, usually if one of the controlled or prohibited substances is found in the preliminary screening. Reconfirmation analysis may repeat the TLC and GC tests and will also use the more sophisticated tests of mass spectrometry or ultraviolet (UV) analysis.

According to McDonald, when the specimens arrive at the Laboratory, it is not known whether any prohibited or controlled substance is present. Although there are literally thousands of drugs and chemicals that may be present, the Laboratory routinely tests for only 20 to 30 substances which are most likely to be administered to horses and which recur rather frequently in the specimens received from the racetracks.

The preliminary screening of the specimens is usually done by laboratory technicians, with the reconfirmation analysis being done by Chemist III's and IV's. McDonald had become dissatisfied with Lee's performance because Lee kept coming back with inconclusive results on reconfirmations, although such results are considered rare in the Laboratory. McDonald had had to assign Lee to do daily rechecks on minor controlled medicine violations, although Lee was the only Chemist IV who was doing that kind of work.

Because of Lee's repeated inability to reach conclusions, McDonald had chemists Lillian Gachich and Jeff Wang prepare seven test specimens for Lee from already identified specimens. The specimens contained the following substances: dipyrine, caffeine, guaiacol glycerol ether (GGE), phenylbutazone and theobromine. One of the samples was not given and one of them had no prohibited substance. Lee reached no conclusion on any of the samples and did not complete the tests on the GGE.

Shelly Kalita, a laboratory technician, testified that plaintiff had tried to grab a bottle of chloroform from her in the quantitative analysis laboratory. He had walked into the room as she was taking the bottle

---

[1] pH levels indicate the relative acidity or alkalinity of a substance. pH 7 is considered neutral, with pH values of 0 to 7 indicating acidity and pH values of 7 to 14 showing alkalinity. The further the pH level is from pH 7, the more concentrated is the substance's acidity or alkalinity.

from under the sink and he began yelling at her, telling her to put the bottle back and that she had no business taking it. Chloroform is a dangerous substance if spilled on the skin and Ms. Kalita became frightened and began calling for help. Lee momentarily blocked Ms. Kalita's exit from the laboratory, screaming and saying that she was a troublemaker and that he would see that she was fired. Ms. Kalita returned to the TLC laboratory but was crying and a bit shaken after the incident, so she went home for the day. Lee denied that he grabbed the bottle, stating that he asked Ms. Kalita to give it to him.

Navin Pandya, a technician in the laboratory, testified that on December 16, 1976, he had a conversation with Lee a few blocks from the Laboratory while he was on his way to work. Pandya was getting off the bus when Lee called him over to his car and told him to get inside. Pandya got into Lee's car and Lee told him to write something on a certain memo. When Pandya refused, Lee became angry and began shouting at him. Lee told Pandya to do as he said because, Pandya testified, Lee has "some bad friends." Pandya, who had been in the country for about six months, became somewhat nervous and started to cry. According to Lee's testimony, Pandya voluntarily signed the papers.

Pandya also testified that, in a separate incident which occurred in October 1976, Lee had told him to put unpurified chloroform into bottles which were labeled purified chloroform. Although Lee did not deny giving such an order, he testified that the bottles were for his own use.

Lee testified on his own behalf, claiming that there was no reason to give him the test specimens and that McDonald was actually retaliating for an alleged bribery incident in which Lee had questioned McDonald's actions. Lee further testified that McDonald mismanaged the Laboratory and generally denied the incidents involving Ms. Kalita and Pandya. Lee also called an expert witness who testified that, in his opinion, Lee was a competent chemist.

After hearing additional witnesses in rebuttal, the hearing officer found that the charges had been proved and recommended that Lee be discharged. The Commission adopted the hearing officer's findings and rulings and ordered Lee's discharge. The circuit court of Cook County affirmed the Commission in the administrative review action, and Lee has appealed.

OPINION

I.

Lee first contends that the ordering of his dismissal was against the manifest weight of the evidence. There is no question that the court's function in an administrative review proceeding is to determine whether the administrative decision is supported by substantial competent

evidence and that the administrative agency's decision should be affirmed unless it is contrary to the manifest weight of the evidence. (*Davern v. Civil Service Com.* (1970), 47 Ill. 2d 469, 471, 269 N.E.2d 713, 714, *cert. denied* (1971), 403 U.S. 918, 29 L. Ed. 2d 695, 91 S. Ct. 2229.) We conclude that there is sufficient evidence to support the findings as to each of the charges brought against Lee.

The first charge pertains to the series of unknowns given to Lee. Lee was directed to analyze the specimens and report his results and conclusions within a reasonable time. There is no doubt from the record that Lee did not report any conclusions.

The first unknown, referred to as unknown A, was given to Lee on November 8, 1976, at 8:45 a.m. Unknown A contained dipyrine, which McDonald stated could have been identified in one or two days, unless the exhibit was being prepared for court, which requires more time. Lee submitted his results to McDonald on November 17, 1976, stating that he could reach "no conclusion" as to the presence of a controlled or prohibited substance.

Unknown B, which contained caffeine, was given to Lee in the morning of November 9, 1976. His report submitted on November 29, 1976, stated: "There was no time for acid hydrolysis for further analysis, also due to insufficient data, no conclusion can be drawn." According to McDonald, acid hydrolysis was not necessary to identify the caffeine and the process would have in fact destroyed the drug.

Unknown C was not given to Lee. He received unknown D on November 22, 1976, and submitted his report to McDonald on November 30, 1976, again reaching no conclusion. Unknown D was a "blank" which contained no prohibited substance.

Unknown E, containing GGE, was given to Lee on November 29, 1976. Lee's report, submitted to McDonald on December 15, 1976, stated that Lee was unable to complete his analysis of that specimen.

Unknown F contained phenylbutazone. Lee had worked with the drug extensively and McDonald said that Lee had done "thousands" of identifications of the substance. The sample was given to Lee on November 30, 1976, and Lee submitted his report, without conclusion, on December 15, 1976, after McDonald had told him to terminate his work on the sample.

Unknown G was given to Lee on December 1, 1976, and Lee submitted his report, without a conclusion, on December 16, 1976. The sample contained theobromine, which was usually discovered by technicians during routine testing.

Lee challenges the validity of the tests he was given because he was told to submit conclusions in an unreasonably short time. Although Lee defines a conclusion as an unequivocal result, the testimony of the

Laboratory personnel makes it clear that under their procedures a conclusion is not considered a positive identification, but that instead the reconfirmation or recheck is an unequivocal identification. Furthermore, Lee admits that he was also asked to submit opinions and results as well as conclusions, based on routine Laboratory procedures.

There is no merit to Lee's contention that he was not allowed sufficient time for the tests and that the word "reasonable" was not defined at the hearing. The record is replete with testimony of Laboratory employees and George Maylin, the Director of the Equine Drug Testing and Research Program for New York State, that the substances in the unknown samples are routinely found in two days or less through the use of the simple preliminary screenings such as TLC or GC. Lee was given substantially more than one or two days on each specimen. Nevertheless, Lee points out that he was burdened with writing and responding to a large number of office memos during the time he was assigned the test. However, it is clear from the record that Lee had no other assignments during that time and that the Laboratory employees normally process about 50 specimens each day and often do more than that.

■■ The questions regarding the incidents involving Ms. Kalita and Pandya center on the credibility of the witnesses. Lee's testimony about the two incidents contradicts the version presented by the testimony of Ms. Kalita and Pandya. The credibility of the witnesses is to be determined by the hearing officer (*Peterson v. Board of Trustees* (1973), 54 Ill. 2d 260, 263, 296 N.E.2d 721, 723; *Ritenour v. Police Board* (1977), 53 Ill. App. 3d 877, 880, 369 N.E.2d 135, 137-38) and that issue was resolved against Lee. Similarly, Lee's contention that McDonald gave him the test because of a conflict between the two of them turns on which of them was believed by the hearing officer. That question was obviously resolved in McDonald's favor, for the hearing officer made no findings as to the existence of a personal conflict between Lee and McDonald.

Lee's reliance on *Menning v. Department of Registration & Education* (1958), 14 Ill. 2d 553, 153 N.E.2d 52, and *Middleton v. License Appeal Com.* (1974), 20 Ill. App. 3d 534, 314 N.E.2d 596, is misplaced. While both cases stand for the general principle that the administrative officer's findings must be supported by competent and substantial evidence, neither case contained sufficient competent evidence that could support the findings that the licensees had committed the offenses charged. Unlike *Norris v. Commission on Human Relations* (1975), 26 Ill. App. 3d 528, 325 N.E.2d 818, and *Middleton*, the instant case contains unquestioned evidence that Lee did not complete the analysis of the seven specimens as instructed. The testimony of McDonald, Wang, Pandya, Ms. Kalita, Raymond Lyons and Kathleen George establishes both the practices in the Laboratory and Lee's encounters with Ms. Kalita

and Pandya. Lee's arguments are addressed to the interpretation of the evidence rather than its sufficiency. Accordingly, we affirm the findings as to each of the charges brought against Lee.

## II.

Lee next contends that he was not dismissed for cause as required by section 8b.16 of the Personnel Code (Ill. Rev. Stat. 1977, ch. 127, par. 63b108b.16). As Lee points out, "cause" has been defined as follows:

"Proper cause for discharge has been judicially defined as some substantial shortcoming which renders an employee's continuance in employment in some way detrimental to the discipline and efficiency of the service and something which the law and a sound public opinion would recognize as a good cause for his no longer occupying the position. [Citation.]" *Norris v. Commission on Human Relations* (1975), 26 Ill. App. 3d 528, 539-40, 325 N.E.2d 818, 826.

The Laboratory was established by the Board, pursuant to section 9 of the Illinois Horse Racing Act of 1975 (Ill. Rev. Stat. 1977, ch. 8, par. 37—9(f)), to conduct tests of blood and urine samples from winning horses and other designated horses, prior to the award of the purses after a race. The payment of the purses must be made within 72 hours after the completion of the race. Because of the vast number of chemical compounds in existence, the Board limits its testing to a search for the 20 or 30 substances which are most likely to be administered to horses. These substances occur frequently and include those given to Lee.

Of the six samples given to Lee, one contained no controlled or prohibited substance. Unknown A contained dipyrine which, according to Ray Lyons, produces test results so distinctive that if one has seen it before, it should be easily recognized. Although dipyrine is not commonly seen in the Laboratory, Lee testified that he had performed reconfirmation tests on the substance about two years before he was given the unknown sample. Unknown B contained caffeine, a very common substance, and was not identified. Unknowns E and F contained GGE and phenylbutazone, respectively, which are very common substances. Phenylbutazone is a permitted substance and is found in thousands of samples. Unknown G, containing theobromine, is also fairly common and had been identified by technician Kathleen George in about four hours. Chemist Ray Lyons testified that an entire series of tests to find theobromine, including the use of mass spectrometry, would take no more than three days.

In almost every instance an initial identification of the samples given to Lee could have been done in one or two days through the use of TLC

and GC. Lee ran those two tests, as well as others, but failed to reach a conclusion as to the presence of a substance, although he had the samples for 6 to 13 working days.

It is apparent that Lee was unable, for whatever reason, to commit himself to a conclusion as to the presence of a substance within a time frame that approached the 72-hour deadline under which the Laboratory operated. It is also apparent that, in spite of the established terminology and practices in the Laboratory, Lee adamantly adhered to his own definitions and procedures, which may have contributed to his inability to identify the unknowns within the day or two it should have taken.

What emerges from the evidence is a picture of Lee as a chemist who is unsuited to the work in the Racing Board Laboratory. He could not commit himself to the identification of a substance within 72 hours, he did not perform the tests on the unknown in the sequence normally followed in the Laboratory, and he did not fully record all of his procedures, a step which is basic to Laboratory work and necessary because the work of the Laboratory may eventually become an exhibit in a criminal case. See Ill. Rev. Stat. 1977, ch. 8, par. 37—36.

Lee stresses his educational and professional background but, as McDonald pointed out, Lee's work in the Laboratory marked a departure from his previous work. Lee had been an inorganic synthesis chemist, involved in combining chemicals to develop new compounds. Lee's work in the Laboratory, on the other hand, was as a forensic analytical chemist whose job was to analyze the components of a substance to identify a limited number of compounds. While Lee may have formidable credentials as a chemist, his work clearly did not meet the needs of the Laboratory, which required that a decision be made within a limited period of time.

We do not agree with Lee's contention that it was unfair or unethical to give him the test. McDonald testified that Lee had caused some problems on two important cases and that he had lost confidence in Lee to the point that he could not trust Lee's results and had to relegate Lee to tasks which were normally not performed by a Chemist IV. Dr. Maylin testified that he often gives the chemists in his lab test unknowns as controls. Moreover, Dr. Aija Zirnis of Regis Chemical Company testified that it is not unethical to give a chemist a substance and ask him to identify it, if it is within the field familiar to the chemist. Here, the unknown test samples contained commonly recurring substances which were seen often in the Laboratory.

We believe that the inability of Lee to perform the test is, of itself, sufficient cause for his dismissal. When coupled with the problems Lee had with his co-workers, the cause for his dismissal is even more

pronounced. Consequently, we find no error in the Commission's order discharging Lee from employment with the Board.

## III.

Lee raises two subordinate issues, maintaining that he was illegally suspended without pay and that the Board violated personnel rules requiring annual evaluations of employees. We find no merit to these contentions.

Lee cites section 11 of the Personnel Code (Ill. Rev. Stat. 1975, ch. 127, par. 63b111) which provides that suspensions pending a hearing may not exceed 120 days to support his position that his suspension was illegal. However, that limitation applies only to a suspension imposed by the Commission for disciplinary purposes in making its findings and decision or approving those of the hearing officer pending investigation of the charges. No such suspension had been ordered in the instant case. This issue was raised at the outset of the hearing on April 4, 1977, when Lee's counsel entered into a discussion with the hearing officer as to the absence of any presuspension or predischarge hearing and concluded, "For the record, I would object to having my client discharged prior to a discharge hearing." The objection was expressly noted, but no ruling was made or requested thereon. We have previously held that due process does not require a hearing prior to suspension because an unrestricted hearing on the merits of the suspension and discharge with a full panoply of trial type safeguards is available as a matter of right, the potential length and likelihood of uncompensable or permanent loss can be ameliorated or minimized, and the underlying procedures are subject to judicial review. (*Haverly v. Boys* (1979), 77 Ill. App. 3d 312, 320, 395 N.E.2d 1005, 1010.) Lee's salary was subject to interruption pending the hearing on discharge, but in the event of reinstatement he would have been entitled to full compensation for the period for which he was wrongfully suspended or discharged. (Ill. Rev. Stat. 1977, ch. 127, par. 63b111b; *Haverly v. Boys.*) Lee does not maintain that he was prejudiced by the length of time taken by the proceedings, and we find no prejudice which would alter the ultimate findings and decision to discharge him.

In addition, we find nothing in either Department of Personnel Rule 2—270 or section 8b.14 of the Personnel Code (Ill. Rev. Stat. 1975, ch. 127, par. 63b108b.14) that requires a yearly evaluation or implies that the failure to maintain such evaluation acts as a bar to any subsequent action seeking the discharge of an employee. Moreover, we find no prejudice to Lee due to the absence of these evaluations. The acts upon which the charges are based occurred within the span of two months and the earlier charges, which could have been included in prior evaluations, were

dismissed. Lee had a full hearing on the merits of the charges, and we find no error in the ultimate findings and order entered on those charges.

## IV.

To summarize, we conclude that Lee had a full and fair hearing on the merits of the charges and that he has not shown any impairment of the proceedings resulting either from his suspension or the failure of the Board to evaluate his performance annually. The evidence amply supports the charges brought against Lee and establishes that he was not competent to perform the functions of a Chemist IV. Accordingly, the order of the Commission discharging Lee was properly upheld in the administrative review proceedings.

For all of the foregoing reasons, the order of the circuit court of Cook County affirming the Commission's finding and order is affirmed.

Affirmed.

SULLIVAN, P. J., and LORENZ, J., concur.