ELLIOTTE E. GREENE, Petitioner-Appellant, *v.* BOARD OF ELECTION COMMISSIONERS OF THE CITY OF CHICAGO, a/k/a Municipal Officers Electoral Board of the City of Chicago, *et al.*, Respondent-Appellees.

First District (5th Division)   No. 83—305

Opinion filed February 18, 1983.

Ronald S. Samuels, of Washington, Kennon, Hunter & Samuels, of Chicago, for appellant.

Andrew M. Raucci, of Kusper & Raucci, of Chicago (Mickey Levinson, of counsel), for appellees.

PRESIDING JUSTICE WILSON delivered the opinion of the court:

Cassandra Holbert (respondent) filed a petition with the Board of Election Commissioners of the city of Chicago (the Board) objecting to the nomination papers of petitioner, Elliotte Greene, who was seeking to run in an upcoming aldermanic election for the sixth ward in Chicago. The Board sustained respondent's objections. Petitioner appeals the trial court's affirmance of that decision.

On January 10, 1983, respondent, a registered voter of the sixth ward in Chicago, filed a petition with the Board objecting to petitioner's nomination papers. Respondent's petition alleged that petitioner was ineligible to be placed on the ballot because his nomination papers failed to contain 342 valid signatures, the minimum number needed. Respondent requested that petitioner's name be stricken from the list of candidates for alderman.

On January 13, 18, 21, 22 and 24, 1983, the Board conducted hearings on the objections. Petitioner stated that he was entering a limited and special appearance, that he had never received service of process and that the Board therefore lacked jurisdiction over the hearings. The Board responded that the sheriff's return indicated that service on petitioner had been attempted four times, an attempt was made to serve him by certified mail and that petitioner had received actual notice in addition thereto because his attorney had appeared for him on the first day of the hearings. Over counsel's objection, respondent then called petitioner as an adverse witness.

Petitioner's testimony was conflicting. First, he stated that he had not learned until that morning, January 18, that his nominating petitions had been objected to and that he had never seen a copy of respondent's objections. Upon further questioning, however, petitioner said that several weeks ago (after the objections had been filed) he called an attorney and they discussed his nominating petitions as well as the objections. The attorney thereafter obtained a copy of the objections and he and petitioner spoke. On cross-examination, petitioner again stated that he had neither personally received a copy of the respondent's petition nor had he received a notice of the Board's call. He said that he had not intentionally avoided service of process.

The Board chairman next questioned petitioner. He stated that he was an insurance salesman, that he rarely received business mail at home and that his mother usually checked his mailbox. Petitioner had not looked in his mailbox in a week. The only mail he had received or that had been received for him was a rate announcement from an insurance company. No further questions were asked of petitioner.

Petitioner then reiterated his argument that the Board lacked jurisdiction, whereupon the Board chairman answered that had no one

appeared on petitioner's behalf, the case would have been defaulted but that since an attorney had appeared and went forward, jurisdiction attached. The Board chairman further stated that the law could not be interpreted to permit the defeat of an objector's petition merely by a candidate's "going on vacation" in an attempt to avoid service. The Board then permitted respondent to go forward with the case. When petitioner asked whether respondent must make out a *prima facie* case, respondent interjected that petitioner was now in fact arguing the merits of the case and that by doing so he waived his special and limited appearance. The Board chairman responded that because the Board had jurisdiction and because the respondent's petition was verified, it would proceed. The Board then ordered a binder check.

The binder check resulted in the disqualification of 165 of the names on petitioner's nomination petitions. Only 265 valid signatures remained. The statutory minimum number of signatures needed to be placed on the sixth ward aldermanic ballot was 342.

Petitioner challenged the thoroughness, accuracy and relevancy of the binder check procedure. He maintained that a voter's eligibility for purposes of signing a nominating petition should be determined at the time the voter signs the petition and not when a binder check is later made. Petitioner pointed out that a voter who had moved into the sixth ward from a different ward, who had not notified the Board of a change of address and who signed a nominating petition in September 1982 would erroneously be considered unqualified because a binder check in January 1983 would show that the voter was not registered in the sixth ward on the day he had signed the petition. The Board countered that if a voter's name could not be found in the binder, the master files would then indicate whether or not the voter was registered at the address shown on the nominating petition. The Board thereupon admitted the binder check report into evidence. A master file examination was then granted, pursuant to petitioner's request.

Following the master file examination, petitioner continued his argument before the Board. He first called Robert Sawicki, the assistant executive director for the Board. Sawicki testified that most of the Board's work was done under his supervision and control. His duties included issuing the Board's reports on hearings such as the present one. Sawicki explained that when a voter's registration was challenged, the binder and master file would be checked. He also stated that at certain times, a record is kept of cards that are removed from the binder. The Board then terminated counsel's exami-

nation of Mr. Sawicki on the grounds that there was no evidence in the record to show that any voter cards in question in this hearing had been removed. Petitioner continued to argue before the Board, stressing that the respondent has the burden of proof that the signatures on his nominating petition were invalid. Respondent replied that since petitioner was challenging the Board's procedure, those signatures questioned should be sent back to be examined by the Board's handwriting expert as conclusive evidence as to whether they were forgeries. In an attempt to finally settle this dispute, the chairman of the Board ordered the entire matter sent back for a special search to be as exhaustive as at all possible, commenting, "We will stay here all night if we have to." When asked by the Board as to how much time he would need to prepare, Sawicki stated that it would take about nine minutes for his staff to get organized. The record reveals that immediately thereafter, petitioner and his counsel left the building. Respondent so informed the Board chairman, who directed that since petitioner "did not see fit to cooperate *** but instead has decided to go out for lunch, the work will proceed and begin immediately." Petitioner and his counsel apparently returned soon afterwards, for the record further reveals that they observed the record search procedure.

The record search resulted in petitioner gaining no additional valid signatures. Upon examination by the Board chairman, Carmen Panico, manager of records processing for the Board, testified that he participated in the record analysis of the names given to him by petitioner and that his staff checked the master files, the "new kick-ins" (the daily processing that comes to the board which must be filed into the master file units) and the file maintenance "runs" (new registrations and change of address records from the computer). Panico explained that the file maintenance reports would reflect a voter's change of address within the same ward as well as a change of address from one ward to another ward. These records were made available to the Board's staff to examine. At petitioner's request, file maintenance reports were provided for September through November, 1982. Entries in the maintenance reports during the last two days of August were included in the September 1982 report. File maintenance reports for each day beginning September 1 were made available to petitioner. The last date of the file maintenance report provided was January 21 or 22. Panico further testified that petitioner was provided with (1) the file maintenance report that the Board separately keeps for the public libraries; (2) the file maintenance report for an October 1982 precinct registration and (3) suspense lists (lists which

are prepared as a result of the Board's door-to-door canvas taken prior to each election) for February and October, 1982.

On cross-examination, Panico stated that except for the unprocessed work of his staff, the computer records were current up to January 23, 1983. (The hearings on petitioner's nominating petitions commenced January 13 and ended January 24, 1983.) He stated that approximately two to 3,000 address changes or new registration cards are completed by his staff every day. Under further questioning, Panico said that if a voter moved from a different ward into the sixth ward and had filed a change of address, that person's name would *not* show up in the master file as a registered voter in the sixth ward until the change of address card was processed. The names of registered voters whose registrations had been challenged for failure to vote would be placed in an "inactive unit." Those files were made available to petitioner, Panico stated.

The Board chairman next examined Panico. He testified that all new registrations and change of addresses should either be in the master file or at the assembly point of such cards for insertion in the master file. If they were in neither place, Panico stated that he would be aware of it. Panico stated that when searching for the names petitioner provided him, his staff was directed to look through the cards that had been assembled for insertion into the master file.

Next to testify was Andrew Draus, who was questioned on direct and cross-examination about the worksheets on which results of the binder check are entered. When questioned by respondent as to which column an entry was made when a binder card could not be located, Draus' testimony conflicted. First he said that an entry would be made in one column, but, after further questioning, he stated that it would be made in another. Draus also stated that in some instances either he or another Board employee had printed petitioner's name at the bottom of a worksheet as having personally observed the binder check because "he [petitioner] refused [to sign his own name] because the binder was in court." The Board chairman then stated that he noticed that one worksheet had not been signed by anyone.

Next to testify was Angelo Stenzo, who had worked with Andrew Draus on checking petitioner's nominating petitions. Stenzo said that his job was to enter the line by line results of the binder check on the Board's worksheet according to Draus' directions. On cross-examination, Stenzo merely repeated his duties.

Petitioner then argued that there were "gaps in the system" which prevented many voters from being eligible to sign a nominating petition. Respondent stated that she had sustained her burden of

making out a *prima facie* case and rested on the report of the binder checks. Petitioner then made a motion for a directed verdict, which was denied.

In holding that petitioner's name would not be placed on the ballot, the Board stated that: (1) the inactive files (which included the names of persons ineligible to vote because of a lapse of four years since the time they voted) had been made available to petitioner, (2) that contrary to petitioner's argument, the Board records *do* reflect prior addresses of voters, and that (3) the Board was bound by its prior decisions which have been that people who sign a nominating petition must be registered to vote at the address they give on the petition. The hearing then terminated. The Board's decision was affirmed by the trial court, and this appeal followed.

OPINION

We first address petitioner's contention that the Board was without jurisdiction to entertain the objections because service of process was never successfully made.

We note at the outset that the Board of Election Commissioners is statutorily empowered to receive and hear objections to primary nominating petitions. (Ill. Rev. Stat. 1981, ch. 46, pars. 10—9, 10—10.) The Election Code cited above further provides that a candidate shall receive a call (notice of objections) by registered or certified mail and by the sheriff. (Ill. Rev. Stat. 1981, ch. 46, par. 10—10.) In the case at bar, the sheriff attempted to serve petitioner four times. Service was attempted by certified mail as well. Petitioner finally received notice of the hearings by subpoena. He later testified that he had heard from friends that his nominating papers were being contested. When petitioner did appear before the Board, he stated that he was making a special and limited appearance because the Board had failed to properly serve him.

■ The record reveals and the Board so stated that there was no evidence that petitioner attempted to evade service. His special and limited appearance was duly noted by the Board chairman. The Board stated, however, that since petitioner was present, it would proceed with the hearing and that petitioner could either default or he could choose to participate. Petitioner, in effect, chose to participate. Although he repeatedly stated that he was making a special and limited appearance, he thereafter testified under oath as an adverse witness, cross-examined other witnesses and exhaustively argued the merits of his case before the Board. We conclude that petitioner's participation effectively waived his special and limited appearance. His proper re-

course, had he wanted to preserve his special appearance, would have been to default and then appeal from the Board's decision. Although a special appearance enables a party to present his challenge to jurisdiction without thereby creating it and waiving the point (*Francisco v. Francisco* (1980), 83 Ill. App. 3d 594, 404 N.E.2d 537), the rule in Illinois for many years has been that a special appearance is waived when a party raises a defense (*Powers v. Powers* (1964), 46 Ill. App. 2d 57, 196 N.E.2d 731), makes a motion, files a pleading or takes any other step which the court would have no power to dispose of without jurisdiction of his person. (*Welter v. Bowman Dairy Co.* (1943), 318 Ill. App. 305, 47 N.E.2d 739.) *Any* action taken by a party which invokes the court's power to adjudicate an issue is deemed to be a submission to jurisdiction of the court. (*Miller v. Douglas* (1963), 44 Ill. App. 2d 429, 195 N.E.2d 224 (abstract).) We therefore hold that petitioner's full participation on the merits of the hearing before the Board converted his special appearance to a general appearance. Petitioner therefore waived any defects in the Board's service of process.

We next turn to petitioner's argument that section 10—4 of the Election Code should be construed to mean that to be a qualified voter for purposes of signing a nominating petition, one need only (1) be registered to vote (albeit anywhere in the State of Illinois) and, (2) pursuant to section 6—27, the voter must have resided in the ward for 30 days prior to the next election at the time he signs the petition. (Ill. Rev. Stat. 1981, ch. 46, par. 6—27.) Section 10—4 (Ill. Rev. Stat. 1981, ch. 46, par. 10—4) requires that as to nominating petitions under the Article:

> "*** Such petition shall be signed by the qualified voters in their own proper persons only, and opposite the signature of each signer his residence address shall be written or printed. *** No signature shall be valid or be counted in considering the validity or sufficiency of such petition unless the requirements of this Section are complied with. ***"

Petitioner contends that although the signatory must, of course, be registered to vote, he need not be registered to vote at the address he gives on the nominating petition. We disagree and think that the holdings in *Schumann v. Kumarich* (1981), 102 Ill. App. 3d 454, 430 N.E.2d 99, and *Stout v. Black* (1972), 8 Ill. App. 3d 167, 289 N.E.2d 456, are persuasive on this issue.

In *Schumann*, the court considered the issue of whether the signatories' addresses on a nominating petition were correctly set forth pursuant to the requirements of section 10—4. The court affirmatively stated that although the section uses both the terms "qualified voter"

and "registered voter," the terms are not interchangeable relative to the circulator's affidavit. The court stated that it is not enough that a voter be "qualified." The terms as used in section 10—4 mean that those eligible to sign nominating petitions must be *registered* voters. *Schumann v. Kumarich* (1981), 102 Ill. App. 3d 454, 459.

The petitioner's argument in *Stout* is similar to the one made by petitioner Greene in the case at bar. The petitioner in *Stout* contended that a voter is "qualified" by residence, citizenship and age, and that while registration may be a prerequisite to voting in a specific election, it is not a part of the term "qualified voter." The court disagreed and held that a "qualified voter" refers to a person who has met all the statutory qualifications to vote, including registration when registration is required in the election for the particular office for which nomination is made. *Stout v. Black* (1972), 8 Ill. App. 3d 167, 170.

■ *Stout* and *Schumann* clearly state that to be a qualified voter under section 10—4, one must be registered to vote. We further hold, however, that a person who signs a nominating petition *must be registered to vote at the residence address set forth on the nominating petition.* We have read the provisions of the Election Code *in pari materia* and conclude that this requirement is in accordance with the legislature's intent. To hold otherwise would unnecessarily obfuscate the clear purpose of section 10—4, which seeks to preserve the integrity of the election process by insuring that signers of nominating petitions be duly registered voters in the political division in which they reside. To hold otherwise would also create an unending series of loopholes through which unscrupulous, would-be candidates could escape. While it is patently clear that petitioner had every good intention of obtaining valid signatures from duly registered voters for his nominating petition, were we to construe section 10—4 to mean that a voter could be registered in *any* ward or city in the State of Illinois, it would be exceedingly difficult for the Board to verify that the voter was registered at all. If a person was not registered at the address shown on the nominating petition, the Board would be required to in effect search the voter registration records for the entire State (if the voter had never resided in Chicago but had recently moved there). Of course, such a burdensome responsibility would be untenable. Nonetheless, such a predicament occurred in the case at bar. At least one of petitioner's signatories had moved from a city outside Chicago into the sixth ward. Naturally, the Board could not verify that that person was registered in the sixth ward, and it consequently sustained the objection to that signature as being invalid.

We believe that our holding today comports with the clear intent of section 10—4. In support of this view is the fact that the statute requires that the circulator must be a registered voter and that he must give his residence address. The information required in section 10—4 to be included in the circulator's affidavit is as follows:

> "*** At the bottom of each sheet of such petition shall be added a statement, signed by a registered voter of the political division for which the candidate or candidates shall be nominated, stating his residence address (and if a resident of a city having a population of over 10,000 by the then last preceding federal census, also stating the street and number of such residence), certifying that the signatures on that sheet of the petition were signed in his presence and are genuine, and that to the best of his knowledge and belief the persons so signing were at the time of signing the petition duly registered voters under Articles 4, 5 or 6 of the Code *** and that their respective residences are correctly stated therein." Ill. Rev. Stat. 1981, ch. 46, par. 10—4.

Under the Election Code (Ill. Rev. Stat. 1981, ch. 46, par. 3—2), for voting purposes residence means permanent abode, a person's principal dwelling place. (*Delk v. Board of Election Commissioners* (1983), 112 Ill. App. 3d 735, 738; *Stein v. County Board of School Trustees* (1967), 85 Ill. App. 2d 251, 229 N.E.2d 165, *aff'd* (1968), 40 Ill. 2d 477, 240 N.E.2d 668.) We further agree with the court in *Stein* that:

> "The residency requirement with regard to elections serves as a protection in that it aids in the identification of voters. More importantly, it helps assure that those who are expressing their will have been in the area sufficiently long to become informed on the issues; that they intend to remain there; and that they will have an honest interest in the matter upon which a vote is being taken. These elements are of greater significance when the issue, as here, is essentially a local one." 85 Ill. App. 2d 251, 258.

In addition, we do not believe that a person may have a permanent residence in two places at the same time. *Delk v. Board of Election Commissioners; Stein v. County Board of School Trustees; Anderson v. Pifer* (1924), 315 Ill. 164, 146 N.E. 171.

■ For our final consideration is the propriety of the circuit court's affirmance of the Board's decision. We believe the circuit court's ruling was correct. Findings of an administrative agency will not be reversed or set aside unless they are against the manifest

weight of the evidence. (*Panarese v. Hosty* (1982), 104 Ill. App. 3d 627, 432 N.E.2d 1333; *Williams v. Butler* (1976), 35 Ill. App. 3d 532, 341 N.E.2d 394.) Moreover, the findings of an administrative agency are deemed to be *prima facie* true and there need only be some competent evidence in the record sufficient to support the agency's findings. (*Williams v. Butler* (1976), 35 Ill. App. 3d 532, 538; *Sangamo Construction Co. v. Pollution Control Board* (1975), 27 Ill. App. 3d 949, 328 N.E.2d 571.) We have reviewed the record and find that there is indeed competent evidence to support the Board's decision. Contrary to petitioner's argument, the record shows that the Board's voter registration records were checked beginning with September 1982, the month petitioner began circulating his nominating petitions, and not just for the days of the Board hearings, January 13 through 24. In fact, a Board employee testified that the file maintenance report beginning September 1, 1982, would reflect entries made during the last one or two days of August 1982. We are further convinced that *all* of the Board's voter registration data were made available to petitioner. This data included a binder check, master files, suspense files and computer printouts (file maintenance reports). This report would show a change of address both within the same ward as well as a change that was not within the ward. There was also testimony that even the trays of records that had been alphabetized and were about to be processed were checked at petitioner's request. In addition, the Board's handwriting expert was available to compare signatures that were questioned. As a result of this exhaustive review of the Board's records, petitioner still lacked the minimum number of valid signatures he needed to be placed on the ballot. Although petitioner unrelentingly argued that the Board's method of ascertaining a voter's eligibility to sign a nominating petition was defective, he failed to show that *the objections that were sustained by the Board were improper.* We therefore agree with the trial court that the decision of the Board was not against the manifest weight of the evidence.

For the reasons stated herein, the trial court's judgment affirming the Board's decision is affirmed.

Affirmed.

LORENZ and MEJDA, JJ., concur.