COMMONWEALTH EDISON COMPANY, Plaintiff-Appellee and Cross-Appellant, *v.* PROPERTY TAX APPEAL BOARD OF THE STATE OF ILLINOIS *et al.*, Defendants-Appellants and Cross-Appellees.

Second District  Nos. 82—151, 82—152 cons.

Opinion filed May 17, 1983.—Rehearing denied July 18, 1983.

Neil F. Hartigan, Attorney General, of Springfield (Kathryn A. Spalding, Assistant Attorney General, of counsel), for appellant Property Tax Appeal Board.

Fred L. Foreman, State's Attorney, of Waukegan (James C. Bakk, Assistant State's Attorney, of counsel), for appellant Board of Review of Lake County.

Frederick S. Lane and Ralph E. Loomis, both of Sonnenschein, Carlin, Nath & Rosenthal, of Chicago, for other appellants.

Winnifred F. Sullivan, Minard E. Hulse, Jr., and John B. Truskowski, all of Keck, Mahin & Cate, of Chicago, for appellee.

JUSTICE HOPF delivered the opinion of the court:

Commonwealth Edison Company (Edison) filed separate complaints with the Lake County Board of Review (LCBR) objecting to the 1975 and 1976 real estate assessments of its Zion Nuclear Generating Plant (Zion Station). In separate hearings before the LCBR the Board reduced the Zion Station assessments for both years. The Zion taxing bodies (Zion Park District, Zion Township School District No. 126, City of Zion, Zion Township, and Zion-Benton Library District, hereinafter referred to collectively as Zion), appealed from the LCBR's decisions in both cases to the Property Tax Appeal Board (PTAB). Edison appealed from the LCBR's decision regarding the 1976 assessment.

The PTAB consolidated the 1975 and 1976 appeals. After hearing evidence and argument on these cases, the PTAB determined that: (1) the proper level of assessment for 1975 and 1976 was 27.29% and 28.22%, respectively, as determined by the Department of Local Government Affairs' (DLGA) one-year assessment/sales ratio studies for the year immediately preceding the years in question (1974 and 1975); (2) capitalized operator training costs incurred by Edison as part of the construction costs of Zion Station should be included in the valuation of the Zion Station real property; (3) certain assets which were certified by the State after January 1, 1975, as pollution control facilities but not yet assessed by the State should be included in the county assessment for the 1975 tax year; (4) the proper deduction for a federally imposed operating limitation on the plant was 7% for the 1975 and 1976 tax years, and; (5) personal property in the amount of $9,372,978 should be deducted from the real property assessment for 1976.

Edison filed for administrative review of the PTAB's decision in the circuit court of Lake County. The LCBR also petitioned for administrative review of the level of assessment for the subject tax years.

The circuit court affirmed the PTAB's decisions in part, and reversed them in part. The court found that the PTAB applied the proper levels of assessment and the proper deduction for the operating limitation. In addition, the court found that certain operator training costs were properly included in the real estate assessments for both years. However, the court determined that the PTAB improperly included the value of the two pollution control facilities in the 1975 assessment, as well as certain personal property in the 1976 assessment.

All parties to the action have appealed from various portions of

the circuit court judgment. Edison appeals from the portions of the order which include the operator training costs in the assessments for both years, and set the deduction for the operating limitation at 7%, rather than 15%, for 1975. It also claims the proper level of assessment for 1975 and 1976 is 26.21% and 27.02%, respectively, as determined by analyzing sales data for the years prior and subsequent to the assessment dates.

LCBR appeals from the circuit court's decision regarding the proper levels of assessment for 1975 and 1976, claiming the appropriate factor to be applied is 31.75% for 1975, and 32.33% for 1976. These figures are based upon the use of assessment/sales ratio studies for the three years immediately preceding the tax years in question. (See Ill. Rev. Stat. 1975, ch. 120, par. 482(24).) The Zion taxing bodies joined LCBR in appealing this issue and also challenge, along with the PTAB, the finding regarding the personal property and pollution control deductions.

We first turn our attention to the question of whether the PTAB and the circuit court applied the proper levels of assessment to the subject property for the tax years in question. The PTAB applied assessment factors of 27.29% for 1975, and 28.22% for 1976, based upon one-year adjusted sales ratio studies for the year immediately preceding the years in question. Edison contends the level of assessment should be determined by analyzing the assessment/sales data for the year immediately prior to the tax date in question as well as the year subsequent to that date. The Zion taxing bodies and the LCBR argue that the PTAB was required by statute to use a three-year sales ratio study in determining the appropriate levels of assessment for the years in question. See Ill. Rev. Stat. 1975, ch. 120, par. 482(24).

■ Illinois' system of taxing real and personal property is established by the Revenue Act of 1939 as amended. (Ill. Rev. Stat. 1975, ch. 120, par. 481 *et seq.*) Under the Act the local assessor must assess real and personal property at 33⅓% of its actual value "as determined by the Department's assessment to sales ratio studies for the 3 most recent years preceding the assessment year, adjusted to take into account any changes in assessment levels implemented since the data for such studies were collected." (Ill. Rev. Stat. 1975, ch. 120, par. 501, referencing par. 482(24).) Thus, the local assessor must apply the three-year standard in making the original assessment of real property. (See also *Lake County Board of Review v. Property Tax Appeal Board* (1980), 86 Ill. App. 3d 553, 407 N.E.2d 1022.) The local boards of review are then required to annually equalize intracounty

assessments by raising or lowering the total assessed value of property in any assessment district within the county so that such property is assessed at 33⅓% of its fair cash value. (Ill. Rev. Stat. 1975, ch. 120, par. 589.1.) Again, the 33⅓% figure is determined by analyzing the Department of Local Government Affairs' assessment to sales ratio studies for the three most recent years preceding the assessment year. (Ill. Rev. Stat. 1975, ch. 120, par. 482(24).) After determining the intracounty multipliers, the board then reports the results to the DLGA. (Ill. Rev. Stat. 1975, ch. 120, par. 589.1.) The DLGA reviews the assessment for each county and assessment district within each county and is charged with the duty of equalizing the value and assessment of property between the counties throughout the State so that the total reviewed assessment for each county produces a ratio of assessed to 33⅓% of fair cash value which is equivalent to 100%. (Ill. Rev. Stat. 1975, ch. 120, pars. 611(7), 627.) The proper amount for each county is then certified to the county clerks, who extend taxes on this basis. Ill. Rev. Stat. 1975, ch. 120, par. 632.

The Property Tax Appeal Board is authorized upon petition to review the decision of the boards of review and determine whether certain property was properly assessed. (Ill. Rev. Stat. 1975, ch. 120, par. 592.1.) The PTAB establishes by rule an informal procedure "for the determination of the correct assessment of property." (Ill. Rev. Stat. 1975, ch. 120, par. 592.2.) One such rule, Rule 4D, states "[t]he decisions of the Property Tax Appeal Board will be based upon equity and the weight of the evidence." (Rule 4D, Official Rules of the PTAB.) This same standard is stated in section 111.4 of the Revenue Act of 1939 (Ill. Rev. Stat. 1975, ch. 120, par. 592.4):

"The Board shall make a decision in each appeal or case heard by it, and such decision shall be based upon equity and the weight of evidence ***."

The LCBR and the Zion taxing bodies both argue that since the local assessors, the boards of review, and the DLGA each use a three-year ratio study to determine the 33⅓% figure, the use of other than a three-year study would result in appealing taxpayers being assessed according to a different process than those not appealing. The PTAB defends its application of a one-year adjusted sales ratio study by noting that under Rule 4D it has the authority to base its decision on equity and the weight of the evidence. It argues that the figures applied by it represent the actual level of assessment to fair market value as of the tax dates in question, as determined by the DLGA. Barbara Moore, testifying on behalf of the DLGA, stated that it recommended settlement on a one-year basis, or 27.29% for 1975, and 28.22% for

1976. On the basis of this testimony, the PTAB reasoned that an assessment level at higher than these rates, which would be produced if it used the three-year method, would result in Edison being taxed at a disproportionately higher rate than other taxpayers in Lake County. Finally, Edison urges this court to determine the median level of assessment by analyzing the declining trend in the level of assessment from one year to the next and estimating through the use of graphs the median assessment level as of the particular tax dates in question (*i.e.*, January 1, 1975, and January 1, 1976). As an alternative approach, Edison urges this court to average the sales ratio for the 1975 and 1976 tax years to determine the correct level of assessment as of January 1, 1976. Either method would result in the same assessment level for the years in question.

We have previously considered this precise issue in *Lake County Board of Review v. Property Tax Appeal Board* (1980), 86 Ill. App. 3d 553, 407 N.E.2d 1022. In that case, the PTAB appealed from the circuit court's decision that the assessment level for property in Lake County in 1976 was to be determined on the basis of the three-year adjusted sales ratio study, rather than the one-year study applied by the PTAB. We agreed with the PTAB's argument that it was authorized under Rule 4D to apply the one-year basis if this was necessary in order to do equity. (86 Ill. App. 3d 553, 555, 407 N.E.2d 1022, 1024.) However, we further held that because of the particular circumstances which existed in Lake County during the period in question, the application of the one-year study by the PTAB was inequitable. In affirming the circuit court, we stated:

"There are particular circumstances in these cases which lead us to conclude, however, that the decision of the PTAB was not in accordance with the statutory mandate to base its decision on equity and the weight of the evidence. The contested assessments occurred in 1976. When the use of the 33⅓% assessment level went into effect the State received a three-year grace period to ease the strains of switching from the previous 50% figure to the 33⅓% figure for the years 1975, 1976 and 1977. (See Ill. Rev. Stat. 1977, ch. 120, par. 627. See also *Hamer v. Kirk* (1976), 65 Ill. 2d 211, 219, and *Hamer v. Lehnhausen* (1975), 60 Ill. 2d 400, 409.) Pursuant to the mandate of *Hamer v. Lehnhausen* on remand the record before us reveals that a 'target assessment level has been determined by [the Department of Local Government Affairs] to be 32.33%' as determined on the basis of a three-year adjusted sales ratio study. (See order entered July 13, 1976, in the Circuit Court of

Lake County in General No. 68 MR 4318.) While, of course, this figure is not binding on the PTAB since it was not a part of the Hamer-Lehnhausen litigation, it illustrates the real world in Lake County. Contrasting the 28.22% level assessment found by the PTAB based on a one-year study with the 32.33% based on the three-year study, the result is that only the appealing taxpayers are given the benefit of the lower assessment as determined by the PTAB.

Under the particular circumstances present in Lake County in the period 1975-1977, and considering that the assessment in question falls in the middle of the transitional period, it appears to us to be inequitable to apply a one-year study. The application of the three-year study period in this particular factual setting, on the other hand, would be more equitable and would have the further advantage of resulting in all taxpayers being assessed on a similar basis." 86 Ill. App. 3d 553, 556, 407 N.E.2d 1022, 1024.

The tax dates in question here also fall within the transitional period discussed in *Lake County*, and that case is in our opinion dispositive of the issue presented here despite the recommendations of the DLGA. Under the *Lake County* case, the PTAB and the circuit court should have used the three-year study for determining the median level of assessment for both 1975 and 1976. The proper level of assessment for 1975 is therefore 31.75%. However, the 32.33% assessment level for 1976, urged by the LCBR and the Zion taxing bodies, does not find support in the record. Barbara Moore, supervisor of research and standards in the Department of Local Government Affairs, testified that although the "target ratio" for 1976 was 32.33%, the three-year average for that year was actually 31.93%. Thus, the correct assessment level for 1976 is 31.93%.

■ The next issue concerns the deduction of certain personal property for the 1976 real estate assessment of the station. Both the Zion taxing bodies and the PTAB claim the circuit court erred in deducting from the total cost of Zion Station $18,250,000, representing the total amount upon which Edison already paid personal property taxes. Zion and the PTAB claim the proper amount to be deducted is $9,372,978. They claim the $9,000,000 figure was based upon the manifest weight of the evidence and should, therefore, not have been reversed by the circuit court. *Lee v. Illinois Racing Board Laboratory* (1980), 87 Ill. App. 3d 667, 410 N.E.2d 171.

■ The Zion taxing bodies and the PTAB correctly state that upon review of an administrative proceeding a reviewing court is lim-

ited to ascertaining whether the decision of the administrative agency is against the manifest weight of the evidence. (*Greene v. Board of Election Commissioners* (1983), 112 Ill. App. 3d 862, 445 N.E.2d 1337; *Altman v. Board of Fire & Police Commissioners* (1982), 110 Ill. App. 3d 282, 442 N.E.2d 305.) The findings and conclusions of the administrative agency on questions of fact are held to be *prima facie* true and correct. (Ill. Rev. Stat. 1981, ch. 110, par. 274; *Greene.*) Where it appears that there is evidence to support the findings of the agency, its decision should be affirmed. *Greene.*

In the instant case, the PTAB determined that Edison was entitled to a personal property deduction from its Zion Station in the amount of $9,372,978. This finding is supported by evidence introduced by the Zion taxing bodies that Edison's personal property was listed primarily in its Account 325, which contained the amount found by the PTAB. Edison introduced evidence that its personal property for 1976 was assessed by the Board of Review at $18,250,000, before depreciation. Despite this figure, Mr. Kaczkowski, an appraiser testifying for the Zion taxing bodies, stated that he was unable to determine the basis for the $18,000,000 figure. Edison did not attempt to introduce evidence which would explain what personal property was considered in the $18,000,000 figure. Thus, $8,877,022 in assessed personal property was unaccounted for at the hearing.

■ In reversing the PTAB's decision in this regard, the circuit court found that since Edison paid personal property taxes based on the $18,000,000 figure, then this amount should be deducted from the total assessment of the Zion plant. The court held that to include this amount would result in double taxation to Edison. For the reasons that follow, we believe the circuit court's decision was error.

The question before the PTAB was the propriety of the real property assessment and not the personal property already determined by the Board and upon which Edison already paid personal property taxes. The parties are in agreement that in determining the value of the Zion plant's real property, the PTAB was required to deduct the value of personal property located on the property in question. It is also clear that the PTAB was mandated by both statutory law and its own rules of procedure to base its decisions upon equity and the weight of the evidence. (Ill. Rev. Stat. 1975, ch. 120, par. 592.4.) Although Edison presented evidence that it paid personal property taxes on $18,000,000 worth of personal property, before depreciation, no evidence was introduced to establish that the $18,000,000 assessment was for the same personal property considered in these proceedings. The only evidence regarding personal property at the Zion plant was

the testimony of Mr. Kaczkowski on behalf of the Zion taxing bodies.

The Property Tax Appeal Board, as an administrative agency, cannot base its decisions upon facts, data and testimony which do not appear in the record. (*Village of Hillside v. John Sexton Sand & Gravel Corp.* (1982), 105 Ill. App. 3d 533, 544, 434 N.E.2d 382; *Cook County Federal Savings & Loan Association v. Griffin* (1979), 73 Ill. App. 3d 210, 215, 391 N.E.2d 473.) Its findings must be based on evidence introduced in the case, and nothing can be treated as evidence which is not introduced as such. (See *Cook County Federal Savings & Loan Association.*) On the basis of the record before us, we find that the PTAB's decision in this regard was not against the manifest weight of the evidence.

The next issue requires this court to determine the point at which two certified pollution control facilities should be removed from local assessment rolls. Edison's position, and the circuit court's, is that the certified facilities were required by statute to be assessed by the Department of Local Government Affairs (now the Department of Revenue), and could not be assessed locally after the effective date of the certification. (See Ill. Rev. Stat. 1975, ch. 120, par. 502a—5.) The PTAB and the Zion taxing bodies urge us to hold that certified pollution control facilities cannot be removed from local assessment rolls until the Department has actually assessed the facilities and notified the local authorities to remove them from the rolls.

■ Under section 18 of the Revenue Act of 1939, all real and personal property is subject to taxation unless specifically exempted by statute. (Ill. Rev. Stat. 1975, ch. 120, par. 499.) Pollution control facilities are not so exempted. However, pollution control facilities, if certified as such by the State are to receive special tax treatment under the Act. (Ill. Rev. Stat. 1975, ch. 120, pars. 502a—1, 502a—5.) Section 21a—5 states that the effective date of the certificate "shall be the date of the making of the application for the certificate or the date of the construction of the facility, which ever [*sic*] is later." (Ill. Rev. Stat. 1975, ch. 120, par. 502a—5.) Under the Act, pollution control facilities "shall be assessed by the Department for tax purposes." (Ill. Rev. Stat. 1975, ch. 120, par. 502a—4.) Finally, the procedure for assessment or reassessment of such property "shall be conducted in accordance with procedural regulations issued by the Department." Ill. Rev. Stat. 1975, ch. 120, par. 502a—8.

Edison first applied for special tax treatment of the facilities on May 15, 1972. Construction of the facilities was completed sometime prior to January 1, 1975. The Illinois Environmental Protection Agency granted the certificates on April 9, 1975. In the meantime, lo-

cal assessors assessed the property as real property. In a hearing on the assessment held before the Lake County Board of Review on March 5, 1976, Edison produced the two certificates claiming the facilities could not be assessed locally. The LCBR thereupon removed the original costs of the pollution control facilities from the real property assessment for both the 1975 and 1976 tax years, and taxes were levied and paid upon these revised assessments. Subsequently, the Department of Local Government Affairs assessed the facilities for the year 1976 only and notified the Board of Review to remove them from the tax rolls as of January 1, 1976. The facilities have not been assessed for 1975.

Upon appeal of the LCBR's decision, the PTAB determined that the pollution control facilities should have been included in the 1975 assessment because they were not yet assessed for that year by the DLGA. The circuit court reversed, finding that the facilities were entitled to the special tax treatment as of January 1, 1975.

■■ The record in the instant case does not contain documented evidence regarding the Department's procedures for assessing or reassessing pollution control facilities. However, the record indicates that the Department first assesses such property and then issues the certificate to the local assessors who thereupon remove the property from the local tax rolls. Since the Department is authorized under the Act to regulate the procedure for assessing or reassessing certified facilities, the practice of removing a facility from the tax roll only after the Department has notified local authorities is in conformity with the Act. (Ill. Rev. Stat. 1975, ch. 120, par. 502a—8.) This procedure also has the added advantage of ensuring that no facility is overlooked by the taxing authorities. A taxpayer who is responsible for the payment of taxes on a certified facility will no doubt make certain that the Department assesses the facility in accordance with the specific provisions governing such facilities. Further, without some indication of the Department's assessed valuation of a particular facility, local taxing authorities have no way of knowing the precise amount which should be deducted from the overall assessment of the property in question.

■■ Edison argues that once the property was removed from the tax rolls by the Lake County Board of Review, it became "omitted" property under section 220 of the Act, and could not be locally assessed. (Ill. Rev. Stat. 1975, ch. 120, par. 701.) That section states, in part:

> "In the case of property subject to assessment by the Department, the property shall be listed and assessed by the Depart-

ment." (Ill. Rev. Stat. 1975, ch. 120, par. 701.)
While we agree that the Department must at some time assess the pollution control facilities, there is nothing in the Act which mandates the assessment within a certain period of time; nor is there anything in the Act expressly prohibiting local assessors from keeping the property on the tax rolls until such time as they are notified by the Department to remove it. Thus, we do not consider section 220 as contrary to the procedure for assessment or reassessment which is followed by the Department pursuant to its regulatory power. (Ill. Rev. Stat. 1975, ch. 120, par. 502a—8.) Further, while it is clear that the facilities should have been assessed by the Department for the 1975 tax year, as well as the 1976 tax year, the propriety of its failure to do so is not before this court since the Department is not a party to this action. We, therefore, conclude that the board of review and the circuit court erred in removing the facilities from the tax rolls prior to the Department's assessment of those facilities for the year 1975.

Edison next appeals from the circuit court's inclusion of the cost of operator training in the 1975 and 1976 real estate value of the Zion Station. Edison claims the cost of operator training during the construction period does not add value to the real property. It further explains that although it capitalized this expense, it was required to do so by the Uniform System of Accounts and not because it considered the expense as part of the value of the real estate. (See 18 C.F.R., ch. I, subsec. B, pt. 101 (1976).) The PTAB and the Zion tax bodies, with whom the circuit court agreed, argue that these costs are an element of the real estate's value since they are one component upon which the utility rate base is determined. They further argue that these costs would be included in the fair market value of the Station if it were voluntarily sold in the market. Finally, they contend that Edison itself elected to capitalize these expenses over a period of years, and in so doing, treated the costs as adding value to the Station.

Initially, we note that the Uniform System of Accounts does not require the capitalization of operator training costs in a new facility. Rather, it provides that such costs "*may* be capitalized as a component of construction costs." (Emphasis added.) (18 C.F.R., ch. I, subsec. B, pt. 101 (Electric Plant Instruction 3(19)) (1976).) It is clear, therefore, that in capitalizing these costs under this provision, Edison was electing to treat the costs as a component of the construction costs.

At the hearing before the PTAB, the board considered three approaches for determining the value of the real estate. These were the

income approach, the market data approach and the cost replacement approach. The PTAB concluded after testimony and argument that "the correct theory in Illinois for valuing special purpose properties which are owned by Regulated Utilities is to consider the actual book cost because Illinois Commerce Commission recognizes this value in the rate base and allows for the payment of property taxes on the total investment." The parties have not contested this finding of the PTAB.

■ In finding that the costs of operator training should be included in the value of the real property, the PTAB relied upon evidence that nuclear power plants are exchanged in actual market transactions at book cost. Mr. Kaczkowski testified that in the case of new construction the book cost of such a plant is equivalent to the sales price, and includes such items as interest and other overheads. Mr. Schultz, financial vice-president of Commonwealth Edison Company, also testified that the amount capitalized as funds allowed during construction would be included in the sales price as noncash earnings, and would be realized over the life of the property. It is evident, therefore, that Edison's capitalization of operator training costs added to the book value of Zion Station's real property since a sale of that property would include these costs. In addition, evidence was introduced that in determining the utility rate which may be charged by Edison, the Illinois Commerce Commission (ICC) makes an allowance for taxes which Edison is required to pay. In estimating the tax, the ICC considers the total book value of the property in which operator training costs are included. Thus, Edison is able to secure a higher utility rate as its estimated taxes increase. The treatment of operator training costs as assets of the corporation increases this tax estimate and, correspondingly, the utility rate which may be charged. Therefore, on the basis of the record before this court, the finding of the PTAB and the circuit court that operator training costs increase the real property's value is not against the manifest weight of the evidence and is affirmed. *Green v. Board of Election Commissioners* (1983), 112 Ill. App. 3d 862, 445 N.E.2d 1337; *Spiros Lounge, Inc. v. Illinois Liquor Control Com.* (1981), 98 Ill. App. 3d 280, 423 N.E.2d 1366.

■ The final issue is whether the Zion Station real property was properly reduced to account for an 85% operating limitation set by the United States Atomic Energy Commission. The limitation was in effect for all of 1975, and was finally removed on June 25, 1976. Edison claims it is entitled to the full 15% reduction for the 1975 tax year, and a 7.25% reduction (15% pro-rated) for the 1976 tax year,

since it claims this accurately reflects the facts and circumstances as of the assessment dates in question. The PTAB and the Zion taxing bodies argue, however, that the limitation actually reduced the value of the property by only 4% in 1975 and 2% in 1976. They argue that this finding was supported by the evidence and should therefore not be reversed on appeal. *Spiros Lounge, Inc. v. Illinois Liquor Control Com.* (1981), 98 Ill. App. 3d 280, 423 N.E.2d 1366.

We again note that the approach used by the PTAB for determining value was actual book value. Thus, our inquiry focuses on the actual effect this 85% limitation had on the market or fair cash value of the property as of the dates in question. See Ill. Rev. Stat. 1975, ch. 120, par. 501(1).

Mr. Kaczkowski testified that although he initially suggested that the board of review reduce the assessed value by 15%, he revised his opinion when he learned more about the nature of and reasons for the limitation. He testified that when he made his original calculations, he was operating on the assumption that the limitation was a permanent one. However, since that time he learned that the limitation was not as serious as he first thought, and that it appeared to be a temporary, rather than a permanent, one. Although Edison contends that Kaczkowski's revised obsolescence figure was the result of hindsight, a reading of the record does not support this contention. The reasons for the limitation were set forth in a letter from the Advisory Committee on Reactor Safeguards dated December 9, 1974, to the chairman of the United States Atomic Energy Commission (AEC). The letter does not indicate that the limitation was a permanent one. To the contrary, the letter indicates that the AEC was augmenting its startup program of one of the reactors and was considering an earlier transition to higher power due to possible power shortages. Mr. Kaczkowski testified that a reasonable person valuing the plant with full knowledge of the facts behind the limitation would not anticipate it as representing a permanent decrease in value. We do not view the letter as contrary to this testimony.

On this basis, Mr. Kaczkowski reasoned the full 15% reduction would not accurately reflect the effect of the limitation on the actual market value of the property. He testified the 4% and 2% figures for 1975 and 1976, respectively, would be a more accurate indicator of the decrease in market value due to the operating limitation. He also stated that Edison was entitled to a 3% and 5% reduction for 1975 and 1976, respectively, for wear and tear on the property. Thus, he testified Edison's assessment of the property for both years should have been reduced by 7%. The PTAB and the circuit court agreed

with Mr. Kaczkowski and determined that Edison was not entitled to the full 15% reduction. It cannot be said on the basis of the record here that this finding was against the manifest weight of the evidence. *Greene v. Board of Election Commissioners* (1983), 112 Ill. App. 3d 862, 445 N.E.2d 1337.

Consistent with the foregoing analysis, we reverse the circuit court's judgment with respect to the proper level of assessment, the deduction of the pollution control facilities from the 1975 assessment, and the personal property deduction for 1976. The judgment in all other respects is affirmed. The cause is remanded for further proceedings consistent with this opinion.

Affirmed in part; reversed in part and remanded.

UNVERZAGT and REINHARD, JJ., concur.