(No. 58907.—

COMMONWEALTH EDISON COMPANY, Appellant, v. THE PROPERTY TAX APPEAL BOARD *et al.*, Appellees.

*Opinion filed May 25, 1984.—Rehearing denied September 28, 1984.*

Minard E. Hulse, Jr., John B. Truskowski and Patty J. Dyer, of Keck, Mahin & Cate, of Chicago, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Kathryn A. Spalding, Assistant Attorney General, of Chicago, of counsel), for appellee Property Tax Appeal Board.

Fred L. Foreman, State's Attorney, of Waukegan (James C. Bakk, Assistant State's Attorney, of counsel), for appellee Lake County Board of Review.

Frederic S. Lane and Ralph E. Loomis, of Sonnenschein, Carlin, Nath & Rosenthal, of Chicago, for appellees Zion Park District et al.

JUSTICE MORAN delivered the opinion of the court:

This appeal arises out of two complaints filed with

the Lake County board of review (the board of review) by Commonwealth Edison Company (Edison) objecting to the 1975 and 1976 real estate assessments of Edison's nuclear generating plant located in Zion Township, Lake County (hereinafter referred to as the plant). The board of review reduced the assessments, and the Zion Park District, Zion Township School District No. 126, the city of Zion, Zion Township, and the Zion-Benton Library District (hereinafter collectively referred to as Zion) appealed. Edison also appealed from the board of review's decision.

The Property Tax Appeal Board (the Board), after consolidating the two appeals, held hearings pursuant to its statutory authority (Ill. Rev. Stat. 1975, ch. 120, par. 592.3). It made the following findings pertinent to the issues raised in this court: (1) that the proper level of assessment for 1975 and 1976 was 27.29% and 28.22%, respectively, as determined by the Department of Local Governmental Affairs' (the Department) one-year assessment-to-sales ratio study; (2) that capitalized operator training costs should be included in the valuation of the plant; (3) that certain pollution-control facilities, which were not assessed by the State, should be included in the county assessment for the 1975 tax year; and (4) that personal property in the amount of $9,372,978 should be deducted from the real property assessment for 1976.

Both Edison and the board of review filed petitions in the circuit court of Lake County for administrative review of the Board's decision. (Ill. Rev. Stat. 1975, ch. 110, par. 268.) The circuit court affirmed in part and reversed in part the decision of the Board. The circuit court agreed that the proper level of assessment for the 1975 and 1976 tax years was 27.29% and 28.22%, respectively. It also approved the Board's inclusion of capitalized operator training costs in the real property valuation of the plant. However, the court held that the Board

had erred when it failed to deduct, from the overall assessed valuation, the value of certain pollution-control facilities which were certified, but unassessed, by the State in the 1975 tax year. The court also found that the Board improperly included certain personal property in the 1976 real property assessment.

The decision of the circuit court was, in turn, appealed by the various parties. Edison appealed, contesting the operator-training-cost inclusion for 1975 and 1976. Edison also contended that the proper level of assessment for 1975 and 1976 was 26.21% and 27.02%, respectively. Edison reached these figures by analyzing sales data for the years prior and subsequent to the assessment dates.

In the appellate court, the board of review and Zion argued for a 31.75% level of assessment in 1975 and a 32.33% level of assessment in 1976. (115 Ill. App. 3d 371.) These levels were based upon assessment/sale ratio studies for the three years preceding the assessment dates. Zion argued against the credit to Edison for personal property which, according to the circuit court, was improperly included in the 1976 real property valuation. They also joined the Board in contesting the circuit court's finding with respect to the 1975 deduction for pollution-control facilities.

The appellate court made the following determinations: (1) that the Board and the circuit court should have used the three-year study in determining the median level of assessment for both 1975 and 1976; (2) that, as a result, the proper level of assessment for 1975 and 1976 was 31.75% and 31.93%, respectively; (3) that the circuit court erred in crediting Edison for the 1976 tax year, since the Board's determination of the value of personal property was not against the manifest weight of the evidence; (4) that the finding of the Board and the circuit court—that capitalized operator training costs in-

creased the real property's value—was also not against the manifest weight of the evidence; and (5) that the circuit court erred in removing the pollution-control facilities from the local tax rolls prior to the State's assessment of those facilities for the 1975 tax year. We granted Edison's petition for leave to appeal from the appellate court's decision. 87 Ill. 2d R. 315(a).

Four issues are raised on appeal: (1) Did the appellate court err in holding that the proper level of assessment of real property for 1975 and 1976 was 31.75% and 31.93% of the actual value of the plant? (2) Should certain assets, which were certified by the State as pollution-control facilities, be included in the local assessment for the 1975 tax year? (3) Should personal property in the amount of $9,372,978 be deducted from the real property assessment for 1976? and (4) Should capitalized operator-training costs be included in the valuation of the plant?

Turning to the first issue, we note that all of the parties to this litigation have utilized the Department's yearly assessment/sales ratio studies. The Department is responsible for equalizing the level of assessments among the counties of the State of Illinois. (Ill. Rev. Stat. 1975, ch. 120, par. 627.) In order to insure the constitutionally required uniformity (Ill. Const. 1970, art. IX, sec. 4(a)), the Department is directed by statute to lower or raise the total assessed value of property in the several counties, as certified to it by the county clerks, so that, in counties throughout the State, property will be assessed at 33⅓% of its fair cash value as specified by law. (Ill. Rev. Stat. 1975, ch. 120, par. 627.) In carrying out this responsibility, the Department relies upon sale ratio studies which it prepares. These studies compare actual sale prices to assessed valuations to determine the percentage relationship between the valuation placed on locally assessed property and its actual, fair

cash value. Ill. Rev. Stat. 1975, ch. 120, par. 627.

The Revenue Act of 1939, as amended (Ill. Rev. Stat. 1975, ch. 120, par. 482 *et seq.*), provides that real property is to be valued at 33⅓% of its fair cash value. The statute further defines the term "33⅓%" as follows:

> "The term '33⅓%' means 33⅓% of the actual value of real and personal property, as determined by the Department's assessment to sales ratio studies for the 3 most recent years preceding the assessment year, adjusted to take into account any changes in assessment levels implemented since the data for such studies were collected." Ill. Rev. Stat. 1975, ch. 120, par. 482(24).

For the 1975 assessment year, the Department compared assessments to actual sales to develop ratio studies. These studies showed a median level of 1975 assessments to 1972 sales of 35.11%. The levels of 1975 assessments to 1973 and 1974 sales were 32.84% and 27.29%, respectively. Thus, the average level of assessment for the three years preceding the 1975 assessment date was 31.75%. This was the level of assessment adopted by the appellate court. In the instant appeal, the board of review and Zion request our affirmance of the appellate court's decision on this issue.

Likewise, for the 1976 tax year, the Department compared assessments to actual sales to develop ratio studies. These studies showed a median level of 1976 assessments to 1973 sales of 36.90%. The levels of 1976 assessments to 1974 and 1975 sales were 30.66% and 28.22%, respectively. Therefore, the average level of assessment for the three years preceding the 1976 assessment date was 31.93%.

On April 4 and 5, 1978, the Board convened to hear evidence regarding the proper assessment and valuation of the plant for the tax years 1975 and 1976. At this time, the Board heard the testimony of seven witnesses and received over 70 documentary exhibits into evidence.

During these proceedings, each of the various parties urged the Board to adopt their particular method of utilizing the Department's median sales ratios to arrive at the correct level of assessment. Although the litigants disagreed with each others' methodologies, they all used the median levels furnished by the Department. Indeed, this court has allowed the use of these types of studies and the sales ratios produced thereby. (*People ex rel. Wenzel v. Chicago & North Western Ry. Co.* (1963), 28 Ill. 2d 205; *People ex rel. Hillison v. Chicago, Burlington & Quincy R.R. Co.* (1961), 22 Ill. 2d 88.) Since the parties have all utilized the Department's median levels, we are confronted with a single question: What is the correct method for determining the proper level of assessment to be applied to Edison's plant for the subject tax years?

The Board is charged with the statutory duty of establishing "by rules an informal procedure for the determination of the correct assessment of property which is the subject of an appeal." (Ill. Rev. Stat. 1975, ch. 120, par. 592.2.) Pursuant to this authority the Board promulgated Rule 4D, which states: "The decisions of the Property Tax Appeal Board will be based upon equity and the weight of evidence." That same standard is also found in the Revenue Act of 1939, as amended (Act): "The Board shall make a decision in each appeal or case heard by it, and such decision shall be based upon equity and the weight of the evidence." (Ill. Rev. Stat. 1975, ch. 120, par. 592.4.) Under its Rule 4D, the Board applies a level of assessment based on a one-year sales ratio study if necessary to reach an equitable determination regarding an assessment.

After conducting hearings, the Board found that the proper level of assessment for 1975 and 1976 was 27.29% and 28.22%, respectively, as determined by the Department's one-year assessment-to-sales ratio study

for the years immediately preceding the subject tax years. The Board relied upon the testimony of Ms. Barbara Moore, supervisor of research and standards at the Department, in adopting a one-year sales ratio study. In response to questioning from the Board, regarding the proper level of assessment, Ms. Moore stated that, for both years, the single-year average adjusted for policy changes would produce the most appropriate level of assessment. Although inapplicable to the case at bar, we note that this method has since been codified in the Act. See Ill. Rev. Stat. 1979, ch. 120, par. 592.2.

The Board defended its one-year approach in the appellate court by arguing that equity and the weight of the evidence required its application. (Ill. Rev. Stat. 1975, ch. 120, par. 592.2; Rule 4D, Official Rules of the Board.) Although the appellate court agreed that the Board had authority under Rule 4D to apply a one-year basis where necessary to do equity, the court went on to find that under the particular circumstances present in Lake County in the period 1975 to 1977, the application of the three-year study would be more equitable. 115 Ill. App. 3d 371, 376-77.

Before this court, the Board continues to maintain the position that use of a one-year sales ratio study is necessary to do equity. If we disagree, the Board urges our adoption of the three-year approach, as they claim these two methods are the only methods authorized by statute. Ill. Rev. Stat. 1975, ch. 120, par. 592.2; Ill. Rev. Stat. 1975, ch. 120, par. 482(24).

Edison contends that the relevant sections of the Act and Rule 4D of the Board can be read in such a way as to support a 26.21% level of assessment in 1975 and a 27.02% level of assessment in 1976. Edison recognizes the Department's procedure of comparing 1975 assessments to sales for calendar years 1972, 1973, and 1974. Edison further notes that under the procedure pre-

scribed by the Department these three ratios are first added together and then divided by three. Edison would adopt the Department's procedure, but apply it to data for years other than the three years preceding the assessment date.

Edison argues that, given the widespread inflation present in Lake County during the years in question, ratios comparing 1975 assessments to 1972 and 1973 calendar-year sales are too remote from the tax date to be relevant. Edison also alleges that the Board's use of a one-year study resulted in the exclusion of half the relevant sales. It suggests that the more relevant ratios are those which represent a comparison of 1975 assessments to sales for the calendar years immediately preceding and succeeding the assessment date of January 1, 1975. It should be noted that this method of calculating the level of assessment depends on sales occurring after the assessment date. For 1975, the relevant comparisons would be 1975 assessments to 1974 sales and 1975 assessments to sales for 1975, resulting in ratios of 27.29% and 25.13%, respectively. Edison has no objection to then applying the Department procedure of adding these ratios and dividing the total by the number of ratios added. This method would result in a 26.21% level of assessment in 1975. Similarly, use of this method would result in a 27.02% level of assessment in 1976. Edison contends that these figures represent the actual median level of 1975 assessments to January 1, 1975, actual values and of 1976 assessments to January 1, 1976, actual values. Thus, Edison concludes that if the Act and Board Rule 4D cannot be read to support these figures, the Act and rule must bow to the constitutional mandate requiring uniformity. The Illinois Constitution, as adopted in 1970, provides:

> "Except as otherwise provided in this Section, taxes upon real property shall be levied uniformly by valuation

ascertained as the General Assembly shall provide by law." Ill. Const. 1970, art. IX, sec. 4(a).

In 1975, the General Assembly amended section 146(2), as a response to this court's efforts to enforce the Revenue Act of 1939 as written. (See *Hamer v. Lehnhausen* (1975), 60 Ill. 2d 400, 401.) By this amendment the legislature reduced the level of assessment from 50% to 33⅓% and established a three-year transitional period which ran from 1974 until 1977. During that period, counties, such as Lake County, which were assessing at less than 33⅓%, were to come up to the 33⅓% level. This was to be accomplished by subtracting the 1973 median level from 33⅓% and increasing the level of assessment annually by one-third the difference. (Ill. Rev. Stat. 1975, ch. 120, par. 627(2).) As the appellate court correctly noted, the tax years in question fall into that transitional period.

In *Hamer v. Kirk* (1976), 65 Ill. 2d 211, this court upheld the constitutionality of section 146(2) against a taxpayer's challenge, that the legislature could not defer the constitutional mandate for intercounty uniformity for an additional three years. The court noted that a sudden change in assessment policy could lead to chaotic conditions in tax-collection procedures, and, therefore, approved the legislature's graduated plan. (65 Ill. 2d 211, 219.) Under that plan, local officials and the Department were obligated to raise the level of assessment to 33⅓% by 1977, in three equal installments.

In the present case, testimony adduced at the Board hearing from Ms. Moore revealed that although the above statutory level of assessment for 1975 was 31.32% the actual level, based on the three-year approach, was 31.75%. Likewise, the actual level of assessment in 1976, based on the three-year approach, was 31.93%, as contrasted to the "target ratio" for 1976, which was 32.33%. In both years the level of assessment produced

by the three-year average was within 1% of the "target ratios" called for by section 146(2).

The term "33⅓," as defined by amended section 1(24), applies to all assessments made in 1975 and thereafter. (Ill. Rev. Stat. 1975, ch. 120, par., 482(24).) Therefore, in the case at bar, the local assessor was obliged to assess the plant at 33⅓% of its fair cash value as determined by the Department's sales ratio studies for the three most recent years preceding the assessment year. The board of review was then required to equalize the intracounty assessments by raising or lowering the total assessed value of property in any assessment district within the county so that such property was assessed at 33⅓% of its fair cash value. (Ill. Rev. Stat. 1975, ch. 120, par. 589.1.) Once again, the 33⅓% figure was to be determined by the Department's sales ratio studies for the three most recent years preceding the assessment date. (Ill. Rev. Stat. 1975, ch. 120, par. 482(24).) After determining the intracounty multipliers, the board of review reported the results to the Department. (Ill. Rev. Stat. 1975, ch. 120, par. 589.1.) The Department, then, equalized the level of assessments between the counties throughout the State. Ill. Rev. Stat. 1975, ch. 120, pars. 611(7), 627.

This is not a case where the local assessors or the Department have failed to perform their duties under the Act. (See, e.g., Hamer v. Lehnhausen (1975), 60 Ill. 2d 400; Hamer v. Mahin (1970), 47 Ill. 2d 252; People ex rel. Hamer v. Jones (1968), 39 Ill. 2d 360.) Rather, in the instant case, Edison is alleging that execution of the statutory scheme fails to achieve uniformity. Therefore, it has presented an alternate method for achieving a more uniform assessment. Edison claims that support for its novel two-year methodology can be found in the Act. However, we have searched the Revenue Act to no avail for a specific statutory provision which would au-

thorize the levels of assessment that Edison urges upon this court. Similarly, we cannot find a way to read the various portions of the Revenue Act to support Edison's position.

The legislature has the power to define the terms, within a statute, in any reasonable manner. (*Modern Dairy Co. v. Department of Revenue* (1952), 413 Ill. 55, 66.) In section 1(24), the General Assembly defined $33\frac{1}{3}\%$ in terms of the Department's assessment-to-sales ratio studies for the three most recent years preceding the assessment date. In so doing, the legislature was attempting to effectuate the constitutional mandate requiring uniformity in levels of taxation. Its definition must be sustained to the exclusion of Edison's nonstatutory alternative.

Additionally, we find the Board's use of a one-year sales ratio study to be inequitable. Under the Act the local assessor, the board of review, and the Department were required to use the three-year average, which produced a median level of 31.75% for 1975 and a median level of 31.93% for 1976. Whereas, the Board's use of a one-year approach resulted in levels of assessment for 1975 and 1976 of 27.29% and 28.22%, respectively. These levels are far below the statutory target levels set by section 146(2). The inequity of this result prompts us to find that, given the facts and figures of this case, the proper assessment of the property in question can only be reached by application of the three-year approach. Therefore, the proper level of assessment for 1975 and 1976 is 31.75% and 31.93%, respectively, as determined by the appellate court.

The next issue concerns the local assessor's authority to tax certain pollution-control facilities which were certified as such by the State. Evidence presented at the Board hearing established the existence of five pollution-control facilities which were part of the plant's opera-

tion. Construction of all these facilities was completed before January 1, 1975. During the hearings, testimony revealed that three of the facilities had been assessed by the State in 1975 and, therefore, were not included in the plant's real property assessment for that year. The two which were not assessed by the State were the airflow system valued at $641,387 and the excess structures valued at $60,391,000. These two facilities are the subject of the instant appeal.

On May 5, 1972, Edison applied to the Pollution Control Board for certification of these two structures as pollution-control facilities under section 21a—5 of the Act (Ill. Rev. Stat. 1975, ch. 120, par. 502a—5). Certificates were issued to Edison on April 9, 1975. In the meantime, local assessors included the value of these structures in the plant's real property assessment for 1975. Edison protested this inclusion, claiming that these certified facilities were entitled to special tax treatment under the Act. Following a hearing on that assessment, the board of review deducted the original cost of these facilities from the real property assessment for both the 1975 and 1976 tax years. Edison's taxes were levied and paid upon these revised assessments. Thereafter, the Department assessed the two facilities for the 1976 tax year only, and notified the local assessor to remove both facilities from the local tax rolls as of January 1, 1976. As a result, the facilities have not been assessed by either the county or the State for the 1975 tax year.

Edison claims that the facilities in question were certified as pollution-control facilities upon completion of construction. Since construction was completed prior to the assessment date, Edison contends that the State had exclusive jurisdiction to assess the facilities in 1975. The circuit court agreed with Edison on this point.

The Board and Zion argue that, as a result of the board of review's action, the two facilities in question

have been unlawfully exempted from taxation. They contend that the Department is authorized by statute to promulgate procedural regulations. (Ill. Rev. Stat. 1975, ch. 120, par. 502 a—8.) They maintain that the procedure authorized by the Department for removing pollution control facilities from local tax rolls was not complied with in this case. According to the Board and Zion, the facilities should not have been removed from the local tax rolls until the Department sent a letter to the local assessor informing him that the property in question was taxed by the State and instructing him to remove the facilities from the tax rolls for 1975. This was the manner in which the facilities were removed from the local tax rolls in 1976. Essentially, the Board and Zion have developed this "procedure" from a single letter the Department sent to the board of review, dated April 19, 1976, which directed the board of review to remove the two pollution-control facilities from the assessment rolls commencing with the assessment year 1976.

Pollution-control facilities are not exempt from taxation under the Act. (Ill. Rev. Stat. 1975, ch. 120, par. 482 *et seq.*) Rather, they are given special tax treatment. (Ill. Rev. Stat. 1975, ch. 120, par. 502a—3.) They are valued at "33⅓% of the fair cash value of their economic productivity to their owners." (Ill. Rev. Stat. 1975, ch. 120, par. 502a—1.) However, the facility must be certified by the State, as a pollution-control facility before it is entitled to such treatment. Section 21a—5 of the Act states in pertinent part: "The effective date of a certificate shall be the date of the making of the application for the certificate or the date of the construction of the facility, which ever [*sic*] is later." Ill. Rev. Stat. 1975, ch. 120, par. 502a—5.

The facts, in the case at bar, are not in dispute. Edison's exhibit No. 13 demonstrates that May 15, 1972, was the date of application, and uncontradicted testi-

mony at the Board hearing established that construction of all five facilities was completed prior to the January 1, 1975, assessment date. Therefore, although the record does not reveal the exact date on which these two certificates became effective, evidence clearly established that these two facilities were certified by the State as pollution-control facilities prior to the assessment date.

The Act clearly vests the State with exclusive authority to tax certified pollution-control devices. Section 21a—4 reads as follows: "Pollution control facilities shall be certified as such for tax purposes by the Pollution Control Board and shall be assessed by the Department for tax purposes." Ill. Rev. Stat. 1975, ch. 120, par. 502a—4.

Furthermore, under section 220 of the Act, real property omitted in the assessment of any year can be listed and assessed upon discovery. That section states, in part: "In the case of [omitted] property subject to assessment by the Department, the property shall be listed and assessed by the Department." (Ill. Rev. Stat. 1975, ch. 120, par. 701.) Therefore, the State, through the Department (now Department of Revenue) should have taxed the two facilities originally. In failing to do so, they remained under a continuing obligation to tax the facilities upon discovery of their error. Thus, the board of review's action did not create an unlawful exemption under the Act.

The Board and the appellate court found that under section 21a—8 of the Act, the Department was authorized to develop procedures for the effective taxation of pollution-control devices. (Ill. Rev. Stat. 1975, ch. 120, par. 502a—8.) Such procedures, however, must be in conformity with the Act. Since the Act specifically vests the State with authority to tax certified pollution-control facilities and the facilities in question were certified on the tax date, the local assessor was without authority to as-

sess these pollution-control devices. We cannot say that abdication of authority by one taxing unit necessarily vests that authority in another. Nor will we place a burden upon the taxpayer to make sure that the State fulfills its obligation under the Act. For, although a taxpayer is obligated to pay the taxes that he owes, he is not obliged to bear the cost of litigation to compel the State to tax him at a preferred rate in order to escape taxation by the local assessor. Therefore, we find that the board of review and the circuit court properly excluded the value of these two assets in determining the 1975 real property assessment of the plant.

The next issue raised by Edison is whether the Board's determination, regarding the amount of personal property to be deducted from its 1976 real property assessment resulted in the utility being taxed twice for the same property. It is undisputed that for the 1976 tax year, the board of review assessed Edison's personal property, located in Zion Township, based on an original cost of $18,250,000. Edison paid the 1976 personal property taxes that resulted from this assessment.

In the present cause, Edison is contesting the 1976 Zion station real property assessment. All parties agree, however, that in order to value Edison's real property it was necessary to subtract, among other things, the value of any personal property included in the overall cost figure of its plant. Thus, when Edison appealed its 1976 real property assessment, it became necessary for the Board to calculate the amount of personal property located at the plant. Based on the evidence presented, the Board concluded that $9,372,978 of the original cost of the plant was attributable to personal property. The evidence presented on this point included proof of Edison's personal property assessment for 1975 which was tendered by Edison, and the testimony of Zion appraiser, Mr. Kaczkowski.

Mr. Kaczkowski testified that he was the assistant vice-president of the American Appraisal Company. At the time of the hearings, he had been employed with American Appraisal for over 10 years and specialized in work involving public utilities. He further testified concerning his familiarity with the uniform system of accounts, the accounting method used by most electric utilities. It was Mr. Kaczkowski's opinion, based on his knowledge of the uniform system of accounts and Edison's statement to the Illinois Commerce Commission, that the value of personal property could best be determined by referring to Edison's account 325, Miscellaneous Plant Equipment. The investment Edison had in that account was $9,238,042. The witness also testified that he personally went through the Zion nuclear plant on July 23, 1976. When asked, during cross-examination, if he was aware of the fact that Edison's personal property tax was based on an original cost of $18,250,000 the witness stated, "I have never proved to my own satisfaction the source and basis for the $18,000,000." Edison did not offer into evidence any further proof in support of the $18,250,000 figure.

Edison's position is that $18,250,000 should have been deducted from the original cost of the plant in computing the real property tax due. Edison contends that the deduction of only $9,372,978 resulted in the difference of $8,877,022 being taxed twice, once as personal and once as real property. The circuit court agreed with Edison and credited the utility for the difference. The appellate court reversed, finding that the Board's decision was not against the manifest weight of the evidence.

As earlier noted, the Board is required by statute to base its decision, in each appeal, upon equity and the weight of the evidence. (Ill. Rev. Stat. 1975, ch. 120, par. 592.4.) Decisions of the Board are, then, subject to

review under the provisions of the Administrative Review Act (Ill. Rev. Stat. 1975, ch. 110, par. 264 *et seq.*). The Act limits the scope of judicial review by providing that "[t]he findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct." (Ill. Rev. Stat. 1975, ch. 110, par. 274.) Thus, the usual standard for judicial review of an administrative decision is whether it is contrary to the manifest weight of the evidence. *Starkey v. Civil Service Com.* (1983), 97 Ill. 2d 91, 101; *Eastman Kodak Co. v. Fair Employment Practices Com.* (1981), 86 Ill. 2d 60, 76; *Basketfield v. Police Board* (1974), 56 Ill. 2d 351, 358.

The record before us shows only that Edison sought to rely on the board of review's personal property assessment. Apparently, Edison believed the assessment was legally binding on the Board. Such is not the case. The Board is under a statutory duty to conduct hearings and decide each case before it based upon equity and the weight of the evidence presented. In the instant case, the Board, relying on the testimony of the Zion appraiser, found that only $9,372,978 of the original cost of the plant was attributable to personalty. The evidence proffered by Edison, that it paid personal property taxes on $18,250,000 worth of personal property in Zion township, without more, is not sufficient to establish its claim of double taxation.

Double taxation has been defined by this court to mean, "taxing twice, for the same purpose, in the same year, some of the property in the territory in which the tax is laid, without taxing all of it a second time." (*People ex rel. Hanrahan v. Caliendo* (1971), 50 Ill. 2d 72, 83-84, *appeal dismissed* (1972), 406 U.S. 965, 32 L. Ed. 2d 663, 92 S. Ct. 2412; *People ex rel. Toman v. Advance Heating Co.* (1941), 376 Ill. 158, 163.) It results when the *same* property has been taxed twice. See, *e.g., Sanitary*

*District v. Young* (1918), 285 Ill. 423, 425; *People ex rel. Abt v. Wiggins Ferry Co.* (1913), 257 Ill. 452, 458.

In the case at bar, Edison failed to establish that the $18,250,000 worth of personal property assessed by the board of review was, in fact, located at the plant and thus included in the real property assessment which is the subject of this appeal. None of Edison's witnesses valued the property or conducted an independent appraisal of the plant. Instead of presenting evidence to support the $18,250,000 figure, Edison sought to rely on the board of review's decision in the personal property case. However, such determinations are not even accorded a presumption of correctness. (*Lake County Board of Review v. Property Tax Appeal Board* (1980), 91 Ill. App. 3d 117, 122-23; *Western Illinois Power Cooperative, Inc. v. Property Tax Appeal Board* (1975), 29 Ill. App. 3d 16, 22.) As a result, the only evidence regarding the value of personal property at the Zion plant was the testimony of Mr. Kaczkowski, Zion's appraiser. Based on the evidence presented to the Board, we cannot say that its determination was against the manifest weight of the evidence. Accordingly, it must be affirmed.

The final issue to be resolved is whether Edison added value to its plant when it capitalized the cost of operator training. The finding of the Board, that it did, was upheld on review by both the circuit court and the appellate court. For the reasons that follow, we agree.

The record of the Board hearing reveals that virtually all of the operator training occurred while the plant was under construction. This was necessary since, given the nature of a nuclear power plant, there is no on-the-job training as such. A trained work force is, therefore, essential to the plant. This was especially true in the instant case since the Zion station was Edison's first pressurized-water nuclear-reactor generating station.

The expense incurred in training these operators was

immediate and substantial. However, the benefit derived from the expense would be realized over a number of years. Because of this, Edison chose to match the expense with the income that it would generate. The accounting principle which was utilized to accomplish this is called capitalization. Under the uniform system of accounts prescribed for Class A and Class B public utilities and licenses (18 C.F.R., ch. 1, pt. 101, at 246-369 (1976)), training costs which relate to nonconventional facilities or facilities that are new to the utility's operations "may be capitalized as a component of construction cost." 18 C.F.R., ch. 1, subsec. B, pt. 101, at 254 (Electric Plant Instruction 3(19)) (1976).

On January 1, 1975, $9,964,292 of noncapitalized operator training costs remained on Edison's records, and as of January 1, 1976, $9,899,534 remained on the books in that account. Edison contends that this accounting treatment did not increase the value of the real estate. The Board and Zion maintain that these costs are properly included in the real estate's value because they are one component upon which the utility's rate base is determined and because these costs would be included in the fair market value of the station if it were voluntarily sold. They also claim that in treating these costs as an asset and capitalizing the expense over a period of years Edison treated the cost as having added to the value of the plant.

The Board heard conflicting testimony on this issue from several witnesses. Mr. William Townley, appraiser and former chief of the Department's Office of National Affairs, testified that while he was employed at the Department he prepared the Illinois Assessor's Manual. The witness stated that, under the provisions of that manual, local assessors were not instructed to include allowances for operator training in the value of commercial or industrial real property. While Mr. Townley admit-

ted that the manual was not intended to limit the assessor, he stated that, in his opinion, operator training created value to the operating enterprise and not to the property itself.

Mr. Kaczkowski, Zion's appraiser, also testified on this point. He testified that nuclear power plants are exchanged in actual market transactions at book cost. The witness further testified that, in the case of new construction, the sales price equals the book cost, which includes interest and other overheads. Since the sale price of the power plant in question would reflect the noncapitalized operator-training costs remaining on Edison's books, Mr. Kaczkowski concluded that the inclusion of these costs in the real property assessment was proper. Therefore, he stated that he would not deduct the cost of operator training from the value of the plant.

The Board also heard from Edison's financial vice-president, Mr. Schultz, who testified that a similar capitalized overhead, allowance for funds used during construction, would be included in the sale price of the plant as noncash earnings. According to Mr. Schultz, if Edison failed to include this amount in the sale price, it would give up its right to collect those revenues in the future for no consideration.

Additionally, the Board heard testimony concerning the various approaches for determining the value of the plant. After considering the income approach, the market-data approach, and the cost-replacement approach, the Board found that the best method for valuing special purpose properties owned by regulated utilities was to use the book cost, because the Illinois Commerce Commission (ICC) recognizes this value in determining the rate base. We note that this finding has not been contested by any of the parties. Further, evidence adduced at the Board hearing showed that Edison included these capitalized operator-training costs in the value of the

plant, when estimating its 1975 real property taxes in its rate application before the ICC. As a result, Edison was able to secure a higher utility rate. Edison now urges this court to find that the cost of operator training is not properly included in the value of the plant for purposes of ascertaining the amount of real property taxes actually due and owing. We decline to do so, however, in light of the evidence in the record before us.

It is clear from the language of the Federal regulation governing the capitalization of training costs that Edison chose to capitalize these costs and that this treatment was not mandatory. In so doing, Edison elected to treat the cost of operator training as a component of construction cost. As a result, the expenditure was treated as an asset on the company's books. Since the Board found that book cost was the proper method for determining the value of this piece of real estate, it would appear that operator training was properly included in the value of the plant. Moreover, the utilities own treatment of these capitalized costs, in their rate application to the ICC, supports the Board's finding that capitalized operator training costs added value to the real property. Likewise, the testimony of Mr. Kaczkowski, that these costs would be included in the plant's sale price, also supports the decision of the Board.

In reviewing the factual determinations of an administrative agency under the Administrative Review Act, this court will not reweigh the evidence. (*Eastman Kodak Co. v. Fair Employment Practices Com.* (1981), 86 Ill. 2d 60, 76.) Where, as here, a finding of an administrative agency is supported by the record it should be affirmed. *Fenyes v. State Employees' Retirement System* (1959), 17 Ill. 2d 106, 111-12.

For the foregoing reasons, the judgment of the appellate court is affirmed in part and reversed in part. We

reverse the appellate court's judgment with respect to the inclusion of pollution-control devices in the 1975 real property assessment. The judgment in all other respects is affirmed, and the cause is remanded to the circuit court of Lake County for further proceedings consistent with this opinion.

*Affirmed in part and reversed in part and remanded.*